UNITED STATES of America,
Plaintiff–Appellee,

v.

Willie Orlando McKINNON,
Defendant–Appellant.

No. 95–5440.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1996.
Decided Aug. 14, 1996.

**ARGUED:** Robert H. Edmunds, Jr., Stern, Graham & Klepfer, L.L.P., Greensboro, North Carolina, for Appellant. Scott Patrick Mebane, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Walter C. Holton, Jr., United States Attorney, Maranda Freeman, Third Year Law Student, Greensboro, North Carolina, for Appellee.

Before ERVIN and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge NIEMEYER and Senior Judge YOUNG joined.

## OPINION

ERVIN, Circuit Judge:

The district court ruled that police officers had no probable cause to arrest appellant, Willie O. McKinnon, and therefore suppressed evidence found on his person and statements that he made following his arrest. McKinnon now argues that the district court also should have suppressed testimony by his brother Adrian, whom McKinnon identified immediately following his arrest; had this testimony been excluded, McKinnon argues, there would have been insufficient evidence to convict him of unarmed bank robbery. Finding no error in the decision below, we affirm.

### I.

Central Carolina Bank ("CCB"), in Greensboro, North Carolina, was robbed at about 3:30 p.m. on December 13, 1994. Witnesses described the robber as a dark-complexioned black male, about five feet ten, wearing a long dark coat, a hooded sweatshirt, blue jeans, black and white tennis shoes, and sunglasses. He gave the teller a blue piece of paper that said "Stick up. No bate [sic]." He left the bank on foot. Near the bank is a creek, which varies in depth from a few inches to four feet; there are also railway spurs connecting a main railroad line with area businesses.

Greensboro police immediately responded to the CCB. Officer Joseph Jeziorski was provided with the suspect's description and set up surveillance of the railroad tracks, approximately a quarter of a mile behind the bank. He observed three or four black males walking along the tracks and briefly questioned them. After he examined their identification, determined that none had any warrants outstanding, and patted each down for weapons, he let them go on their way, as none matched the robber's description. Shortly thereafter, McKinnon appeared, walking along a railroad spur, dressed only in blue jeans and a long-john shirt, although it was quite cold. After a brief encounter, during which Jeziorski observed that McKinnon's pants were "damp," Jeziorski allowed McKinnon to proceed, and he continued down the main railroad track.

About forty minutes after the robbery, Greensboro Police Detective J.A. Fulmore saw McKinnon walking down the street, and called for backup. On Fulmore's instruction, Officer Mark Ridgill stopped McKinnon, who

cooperated and produced identification. Ridgill asked McKinnon why his pants were wet—soaking wet, as later characterized by Ridgill—and McKinnon said that he had stepped in a puddle. Doubting the veracity of this answer, Fulmore ordered Ridgill to arrest McKinnon. Detective N.O. Rankin interrogated McKinnon while he was in custody, and McKinnon disclosed his name, address, and the name "Adrian." Rankin then found Adrian McKinnon and interviewed him within two hours of McKinnon's arrest.

In the initial interview, Adrian identified his brother in a bank surveillance photograph, and identified the clothing that the robber wore as his own. At trial, Adrian testified that he and McKinnon had left Adrian's house together on the morning of the robbery, with McKinnon wearing a long coat, a black hooded sweatshirt, and blue jeans, all of which belonged to Adrian. He identified the clothing the police had found near the creek as his own. He also disclosed at trial, for the first time, that on the day of the robbery (or possibly the following day), McKinnon told him where the stolen money was hidden, and instructed him to divide the money among himself, McKinnon, and McKinnon's son. Adrian was apparently unable to find the money in his two attempts to do so.

In December, 1994, McKinnon was indicted by a U.S. Grand Jury on the charge of unarmed bank robbery, in violation of 18 U.S.C. § 2113(a). He pled not guilty. The district court granted his motion to suppress statements that he made and evidence discovered on his person immediately following his arrest, which the court found to be fruits of an illegal arrest. Testifying at trial were officers Jeziorski, Ridgill, and Fulmore, as well as Adrian McKinnon. Peter Linder, an FBI "questioned document examiner" testified about his analysis of the robber's demand note. He explained that he believed the paper to have come from the back of an envelope, and he was able to detect indentations on the paper that appeared to have been made by someone addressing the front of the envelope; he specifically found the letters "W–I–L–L," "O," "c," "K," and "I–N."

These letters were in the proper order to have been part of "Willie O. McKinnon."

On February 14, 1995, the jury found McKinnon guilty as charged. On May 5, 1995, the district court sentenced him to 92 months in prison, followed by three years of supervised release, as well as $870 restitution and a $50 special assessment. McKinnon timely filed his notice of appeal on May 25, 1995.

II.

■ As an initial matter, the United States argues that the officers had probable cause to arrest McKinnon, so the evidence obtained following that arrest was admissible. McKinnon notes that the United States never entered a notice of appeal of the district court's order suppressing the evidence, and, in any event, is not authorized to appeal. Under 18 U.S.C. § 3731, "[a]n appeal by the United States shall lie to a court of appeals from a[n] ... order of a district court suppressing or excluding evidence ..., not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information...." (1995). The Fourth Circuit has explained that this statute "authorizes appeals by the government except when a retrial would be barred by the double jeopardy clause of the fifth amendment." *United States v. Shears*, 762 F.2d 397, 400 (4th Cir.1985). Because the suppression order was entered after McKinnon had been put in jeopardy, and before the verdict was rendered, the United States may not appeal. Thus, for purposes of this appeal, the district court's decision to suppress the evidence stemming from McKinnon's arrest is not at issue.

III.

■ On appeal, this court reviews "legal conclusions involved in the district court's suppression determination *de novo* but review[s] factual findings underlying the legal conclusions subject to the clearly erroneous standard." *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

McKinnon argues that Adrian's testimony was the fruit of the poisonous tree, as it came about as a direct result of the illegal arrest. We disagree, however, with McKinnon's argument that the court erred in admitting Adrian's testimony at trial.

■ There are several doctrines under which evidence unearthed as a result of an illegal search or seizure may be admitted into evidence.[1] Of significance in this case is the attenuation doctrine, which the Supreme Court recognized in *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The Court noted that although evidence may be obtained as a result of an illegal search, at some point the connection between the illegal conduct and the ultimately-discovered evidence "may have become so attenuated as to dissipate the taint." *Id.* at 341, 60 S.Ct. at 268. In addressing whether *Miranda* warnings may attenuate the taint of an illegal arrest on a subsequent confession, the Court declined to set forth a bright line test for application of the attenuation doctrine. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[2] Instead, the Court explained that a number of factors inform the inquiry, including whether *Miranda* warnings were given, the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2261–62 (citations omitted).

The Supreme Court elaborated upon the attenuation doctrine in *United States v. Ce-colini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). A police officer conducted an illegal search while in a flower shop, and discovered evidence that the owner was involved in gambling. *Id.* at 270, 98 S.Ct. at 1057. The defendant owner moved to suppress the testimony of his employee, offered at his perjury trial, on the grounds that the testimony was the fruit of the poisonous tree. *Id.* The Court concluded that the connection between the illegal search and the trial testimony was sufficiently attenuated to remove the taint, based on consideration of a number of factors. *Id.* at 279–80, 98 S.Ct. at 1061–62. The inquiry underlying these factors is whether the remedial purposes of the exclusionary rule would be served by suppressing evidence connected with an illegal search. *Id.* at 275, 98 S.Ct. at 1059–60. When testimony of a live witness is being challenged, courts should look to "the degree of free will exercised by the witness": "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." *Id.* at 276, 98 S.Ct. at 1060. The Court explained that, "since the cost of excluding live-witness testimony often will be greater [than excluding other kinds of evidence], a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278, 98 S.Ct. at 1061. The Court also recognized other relevant factors: whether the illegally-seized evidence was used in questioning the witness; the time between

---

1. In the district court, the United States relied on the inevitable discovery exception to the exclusionary rule. *See Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984) (evidence that would inevitably have been discovered admissible at trial because insufficiently connected to police misconduct such that exclusion would serve a substantial deterrent purpose). We decline to decide this appeal on that basis. The Government's explanation of how it would have discovered Adrian's testimony depends upon a number of shaky conclusions, chief among them the assumption that once Adrian were found he would have provided the same information even if McKinnon had not been in police custody at the time Adrian was questioned. We simply do not decide whether the disputed evidence would inevitably have been discovered in the absence of the police misconduct. Instead, we shall exercise "the well-recog-nized authority of courts of appeals to uphold judgments of district courts on alternate grounds." *Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir.1996) (en banc).

2. *Brown* involved the interplay between the Fourth and Fifth Amendments, and the Court specifically found that *Miranda* warnings, while adequate to protect a defendant's interests under the Fifth Amendment, are not necessarily sufficient to carry out the purposes of the Fourth Amendment. *Id.* at 601, 95 S.Ct. at 2260–61. Even though here we have the testimony of a third party—in which attenuation is even more likely than in the case of a suspect's confession—the *Brown* Court's analysis is helpful to a more generalized discussion of the attenuation doctrine.

the illegal search and initial contact with the witness; whether the investigators knew of the relationship between the witness and the defendant prior to their illegal search; and whether the police conducted the illegal search intending to find evidence implicating the defendant. *Id.* at 279–80, 98 S.Ct. at 1061–62.

■ Although a number of the *Brown/Ceccolini* factors suggest a rather close connection between McKinnon's illegal arrest and police questioning of Adrian, we find that the taint of the police misconduct was sufficiently attenuated to justify admission of Adrian's testimony. When Officer Rankin initially spoke with Adrian, he asked him to identify the man in the bank surveillance photograph. Adrian identified the robber as his brother, Willie McKinnon. Rankin also asked Adrian to identify the clothing in the photograph, which he identified as his. The photograph and the clothing were wholly unrelated to the illegal arrest, and no illegally-seized evidence was shown to or used in questioning Adrian.

■ Also of great significance is the fact that Adrian freely and immediately cooperated with the police. As the Supreme Court noted in *Ceccolini,* the "degree of free will exercised by the witness"—particularly when the witness is not a criminal defendant—is an important consideration in determining whether such testimony ought to be excluded. 435 U.S. at 276, 98 S.Ct. at 1060. Moreover, Adrian did not reveal that his brother had asked him to look for the proceeds of the robbery and divide the money until the morning he was to testify. Disclosure of this damning testimony was significantly attenuated from the illegal arrest by the passage of time.

We find that the trial court properly admitted Adrian McKinnon's testimony against his brother. Having reached this conclusion, we need not consider McKinnon's argument that, in the absence of Adrian's testimony, there was insufficient evidence to convict him.

IV.

For the foregoing reasons, the district court's decision to admit the testimony of Adrian McKinnon in Willie McKinnon's bank robbery trial is

*AFFIRMED.*