RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0351P (6th Cir.)
File Name: 03a0351p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　*v.*　　　　No. 01-6294

STEPHEN D. AKRIDGE,
　　　　　*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 00-00081—Curtis L. Collier, District Judge.

Argued: April 29, 2003

Decided and Filed: October 2, 2003

Before: MOORE and ROGERS, Circuit Judges; KATZ,
District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Rita C. LaLumia, FEDERAL DEFENDER
SERVICES OF EASTERN TENNESSEE, INC.,

———————————

[*] The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

---

Chattanooga, Tennessee, for Appellant. Gary Humble,
ASSISTANT UNITED STATES ATTORNEY, Chattanooga,
Tennessee, for Appellee. **ON BRIEF:** Rita C. LaLumia,
FEDERAL DEFENDER SERVICES OF EASTERN
TENNESSEE, INC., Chattanooga, Tennessee, for Appellant.
Gary Humble, ASSISTANT UNITED STATES
ATTORNEY, Chattanooga, Tennessee, for Appellee.

KATZ, D. J., delivered the opinion of the court, in which
ROGERS, J., joined. MOORE, J. (pp. 25-31), delivered a
separate dissenting opinion.

———————————

**OPINION**

———————————

KATZ, District Judge. Defendant-Appellant Stephen D.
Akridge appeals from his convictions for possessing crack
cocaine with the intent to distribute, conspiring to possess
crack cocaine with the intent to distribute, possessing a
firearm in furtherance of a drug trafficking offense, and
possessing a firearm after having been convicted of a felony.
Akridge's contention on appeal is that the district court
should have suppressed the pre-trial statements and trial
testimony of Akridge's alleged co-conspirators, Kevin Ellison
and Tiffany Stewart, as the fruits of an illegal search. The
Government argues that the testimony was admissible under
either the "inevitable discovery" or "attenuation" exceptions
to the exclusionary rule. For the following reasons, we
AFFIRM the district court's denial of Akridge's suppression
motion.

## I. BACKGROUND

On January 25, 1999 Chattanooga police officers obtained
a warrant to search Kelvin Ellison's residence, pursuant to
which officers recovered marijuana and firearms. At the time,
Ellison was a convicted felon and the matter was referred to

Special Agent Cordell Malone at the Bureau of Alcohol, Tobacco and Firearms ("ATF"), who in turn presented the case to the United States Attorney's Office for prosecution.

In the early morning of May 2, 2000, Chattanooga police officers received an anonymous telephone tip reporting that the residents of 824 Arlington Avenue were selling drugs. In response to the complaint, officers conducted a "knock and talk" at the residence, which was shared by Akridge and his roommates Kevin Ellison and Tiffany Stewart. During a search of the apartment, officers found marijuana, cocaine, and three loaded semi-automatic pistols.[1] At the time of the search, Ellison was still under federal investigation in relation to the January 1999 charges.

Following the search an officer suggested that the three residents decide who would accept the blame for the contraband, and allegedly indicated that he would see that the other two residents would not be charged. As a result, Stewart was taken to jail and Akridge and Ellison were left at the apartment. Stewart apparently was later released on her own recognizance.

On June 19, 2000 ATF officials interviewed Akridge, Ellison, and Stewart regarding the May 2000 search of their residence. All three admitted to selling crack cocaine and marijuana, and Akridge allegedly further admitted to firearms possession and selling drugs from the Arlington Avenue residence, although he denies making such a confession.

Akridge, Stewart, and Ellison subsequently were arrested on June 20, 2000 for drug trafficking and firearms possession. On June 27, 2000 Stewart executed a plea agreement, not entered of record with the Court until January 5, 2001, in

---

[1] As discussed further *infra*, the officers conducted the search pursuant to the residents' consent, which the district court ultimately determined was coerced.

which she pled guilty to a charge of aiding and abetting Ellison and Akridge in drug trafficking. On October 3, 2000 the Government reached a plea agreement with Ellison.

On January 22, 2001 the district court granted Akridge's September 11, 2000 motion to suppress evidence seized during the May 2000 search of his apartment, as well as his subsequent statement given on June 19, 2000.[2] Thereafter, on April 9, 2001 Akridge filed a motion to enlarge the scope of the district court's prior suppression order to encompass all previous and future testimony of co-defendants Ellison and Stewart, reasoning that the testimony was a direct result of the May 2000 illegal search. It is this motion that is at issue on appeal.

The district court conducted a hearing on the motion on April 30, 2001. By agreement of the parties, the court did not hear testimony but rather relied on the factual findings from the earlier suppression hearing, plus three new affidavits from Stewart, Ellison, and ATF Agent Malone. After review of the record, the district court denied Akridge's motion and on May 7, 2001 Akridge proceeded to trial.

At trial Ellison and Stewart testified on behalf of the prosecution. The Government also presented the testimony of Akridge's neighbor and Akridge's aunt,[3] as well as a tape

---

[2] The district court determined that the Chattanooga police officers' method of obtaining consent to search warranted exclusion of not only the physical evidence seized in the May 2000 search, but also Akridge's subsequent June 19 confession.

[3] Akridge's aunt and neighbor both testified that they had purchased drugs from Akridge.

of an incriminatory phone call made from the Hamilton County jail by Akridge to his girlfriend.[4]

Ellison testified at trial that he had known Akridge for approximately fifteen years and had lived with him from October 1999 until June 2000. According to Ellison, he and Akridge supported themselves during this period by selling crack cocaine and marijuana. Ellison also testified about Akridge's possession and use of firearms.

Stewart, Ellison's girlfriend, lived with Ellison and Akridge and testified about her role in distributing drugs for Akridge and Ellison. Stewart also testified about Akridge's possession and use of firearms.

The jury returned guilty verdicts on Counts 1, 4, 5, and 6, which respectively charged Akridge with conspiracy to distribute in excess of fifty grams of cocaine base in violation of 21 U.S.C. § 846, possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), possession of a 9mm semi-automatic pistol in furtherance of drug trafficking crimes for the period October 1999 to May 2, 2000 in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a 9mm semi-automatic pistol on or about December 31, 1999 in violation of 18 U.S.C. § 922(g)(1).

A pre-sentence report was prepared, to which Akridge objected in part because the report included information predicated upon statements made by Ellison and Stewart. The district court ultimately sentenced Akridge to 360 months on Counts 1 and 4 to run concurrently with 120 months on Count 6. The district court further sentenced Akridge to 300 months on Count 5 to be served consecutively, resulting in a total of 660 months imprisonment.

---

[4]As characterized by the Government, during this phone call Akridge criticized Ellison's cooperation with the Government and complained that Ellison was disclosing everything that Akridge had done since he was released from the penitentiary.

Akridge timely filed a notice of appeal on September 21, 2001 and asserts that the exclusionary rule requires suppression of the statements and trial testimony of Ellison and Stewart.

## II. DISCUSSION

### A. Standard of Review

We review the district court's ruling on Akridge's suppression motion under a mixed standard of review. *See United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003). We reverse the district court's findings of fact only if they are clearly erroneous, but review *de novo* the district court's legal conclusions. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). Where, as here, the district court has denied a motion to suppress, we review the evidence in a light most favorable to the Government. *See United States v. Harris*, 255 F.3d 288, 291 (6th Cir. 2001) (citing *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)).

### B. Exclusionary Rule

The exclusionary rule generally bars the admissibility at trial of tangible evidence, as well as verbal statements, acquired through unconstitutional means. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963). The rule excludes from admissibility "not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks v. United States*, 232 U.S. 383 (1914), but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Murray v. United States*, 487 U.S. 533, 536-37 (1988) ("[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the

unlawful search becomes 'so attenuated as to dissipate the taint'"). "The suppression or exclusionary rule is a judicially prescribed remedial measure and as 'with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" *Segura*, 468 U.S. at 804 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

As explained in *Segura*:

  Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was

    "'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.'"

  It has been well established for more than 60 years that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint," *Nardone v. United States*, *supra*, at 341. It is not to be excluded, for example, if police had an "independent source" for discovery of the evidence[.]

*Segura*, 468 U.S. at 804-05 (internal citation omitted).

Like many legal principles, the exclusionary rule is subject to numerous exceptions that diminish its scope. In addition to developing the independent source doctrine, not at issue in the instant action, the Supreme Court has also endorsed the inevitable discovery doctrine, *see Nix v. Williams*, 467 U.S. 431 (1984), under which the exclusionary rule is inapplicable, even if the initial search and arrest were unlawful, as to evidence that inevitably would have been discovered by lawful means. *Murray*, 487 U.S. at 539 ("The inevitable

discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered*.").

Beyond developing the two foregoing exceptions to the exclusionary rule, the Supreme Court has further delineated standards applicable to the suppression of live witness testimony, *see United States v. Ceccolini*, 435 U.S. 268 (1977), which some courts have come to apply under the rubric of the "attenuation doctrine." *See, e.g.*, *United States v. McKinnon*, 92 F.3d 244 (4th Cir. 1996); *United States v. Dickson*, 64 F.3d 409 (8th Cir. 1995); *United States v. Terzado-Madruga*, 897 F.2d 1099 (11th Cir. 1990). Under *Ceccolini*, "a witness' testimony may be admitted even when his identity was discovered in an unconstitutional search." *United States v. Leon*, 468 U.S. 897, 911 (1984); *see also Ceccolini*, 435 U.S. at 275-78 (concluding that "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required").

In the instant action, the district court determined that under both *Ceccolini* and the inevitable discovery doctrine, the exclusionary rule did not require exclusion of Ellison's and Stewart's testimony. On appeal, Akridge asserts that neither of these doctrines is applicable to save the testimony from exclusion. Upon review, we find that the district court properly denied Akridge's motion.

### C.   District Court's Findings

In the enlargement motion, Akridge moved to suppress "any and all statements given, [and] previous testimony or future testimony of co-defendants Kelvin L. Ellison and Tiffany Stewart . . . [as] directly derived as a result of an illegal search." J.A. at 118. In support of the motion, Akridge argued that "the witnesses were discovered as the

direct result of the illegal search of the apartment[;] [t]he presence and identity of the witnesses and their relationship to the defendant was not previously known to the police, and would not have been discovered in the absence of the illegal search[; and] [t]he witnesses provided statement [sic] regarding crimes which would not have been discovered absent the illegal search and consequent prosecution." J.A. at 124.

In ruling on Akridge's suppression motion, the district court articulated two separate bases for denying the motion. Relying on the fact that Ellison was already under federal investigation for drug trafficking and firearms possession, the district court first determined that the trial testimony of Ellison and Stewart inevitably would have been discovered. The court reasoned that the investigation of Ellison would have revealed his relationship to Akridge and Stewart, and in light of Ellison's averment that the prior firearms charge heavily influenced his decisions with respect to the instant action, the court determined that the exclusionary rule did not apply to Ellison's testimony. As to Stewart, the court reasoned that the Government would have elicited testimony from Stewart, notwithstanding the May 2000 search, due to Stewart's relationship with Ellison and her willingness to enter her plea, even before the district judge had ruled on whether to adopt the magistrate's recommendation to suppress the evidence of the May 2000 search.

As an alternative basis for its ruling, the district court determined that the *Ceccolini* factors weighed against exclusion. In general, the court reasoned that due to Ellison's investigation, law enforcement most likely already knew of Akridge's relationship to Ellison. The court was further persuaded by the timing of Ellison's and Stewart's pleas vis-a-vis the May 2000 search and the magistrate's recommendation to grant Akridge's initial suppression motion. Although the court found that some of the *Ceccolini* factors weighed in favor of exclusion, particularly as to Stewart since she was previously unknown to investigators,

the court determined that the majority of the factors weighed against exclusion. After balancing the cost of suppression against the deterrence effect of exclusion, the court denied Akridge's motion to extend the scope of its prior suppression ruling.

Although the district court relied primarily on the inevitable discovery doctrine, we first address the district court's *Ceccolini* analysis because we find that it more clearly applies to the instant action. Because we determine that the *Ceccolini* factors weigh against exclusion as to both Stewart and Ellison, we affirm the district court's ruling on that basis and do not reach the merits of the district court's "inevitable discovery" determination.

### D.   *Ceccolini*

In *Wong Sun*, the Supreme Court indicated that "the policies underlying the exclusionary rule [do not] invite any logical distinction between physical and verbal evidence." 371 U.S. at 486.    In *Ceccolini*, the Court addressed the concept of attenuation in the context of verbal evidence, ultimately rejecting the foregoing pronouncement from *Wong Sun*.    In so doing, the Court reasoned that "the issue [of attenuation] cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements as well." *Ceccolini*, 435 U.S. at 274.    Thus, the Court expressly rejected the conclusion that "if the road were uninterrupted, its length was immaterial." *Id.* at 275.

Based on *Ceccolini*, it is now clear "that the exclusionary rule does not invariably bar the testimony of a witness whose identity is revealed to the authorities as the result of an illegal search." *Unites States v. Reyes*, 157 F.3d 949, 954 (2d Cir. 1998).    Instead, exclusion is dependent upon the degree of attenuation between the illegal search and the testimony. Relying upon the attenuation principle announced in *Nardone v. United States*, 308 U.S. 338 (1939), and expounded upon in *Wong Sun*, the *Ceccolini* Court weighed a number of

considerations, including that (1) "the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority," (2) "substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness . . . and between the latter and the testimony at trial," and (3) the identity of the witness and her relationship with the defendant "were well known to those investigating the case." *Ceccolini*, 435 U.S. at 279. The Court ultimately concluded that "application of the exclusionary rule in this situation could not have the slightest deterrent effect." *Id.* at 280.

We find no published opinions in this Circuit applying *Ceccolini* in the context of exclusionary determinations relating to witness testimony.[5] Therefore, we first begin by setting forth the relevant factors for consideration in our analysis. After reviewing *Ceccolini* and surveying our sister circuits' application of its holding, we find it appropriate to consider to following factors in making our determination:

(a) the degree of free will exercised by the witnesses;
(b) the role of the illegality in obtaining the testimony;
(c) the time elapsed between the illegal behavior, the decision to cooperate, and the actual testimony at trial; and (d) the purpose and flagrancy of the officials' misconduct.

Relevant to the foregoing factors, a court might further consider: the stated willingness of the witness to testify; the presence of intervening circumstances; the time, place, and

---

[5]We find only one case in this Circuit, albeit an unpublished opinion, applying *Ceccolini* in the context of a suppression determination with respect to witness testimony. *See United States v. Millis*, 89 F.3d 836, 1996 U.S. App. LEXIS (6th Cir. June 19, 1996) (rejecting defendant's arguments for exclusion, reasoning that the fact that the co-defendant witness "initiated his cooperation with authorities on his own initiative, several days after the arrest" demonstrated an independent willingness to testify that dissipated the taint of the original stop).

manner of the initial questioning of the witness; whether the witness himself was a defendant; whether the illegally-seized evidence was used in questioning the witness; the time between the illegal search and initial contact with the witness; whether investigators knew of the relationship, if any, between the witness and the defendant prior to the illegal search; and whether the police conducted the illegal search intending to find evidence implicating the defendant.[6] *See Ceccolini*, 435 U.S. 279-80; *see also United States v. Hughes*, 279 F.3d 86, 89-90 (1st Cir. 2002); *United States v. McKinnon*, 92 F.3d 244, 247-48 (4th Cir. 1996); *United States v. Schaefer*, 691 F.2d 639, 644 (3d Cir. 1982); *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980).

With this framework in mind, we turn to the parties' contentions.

### E.   Identity of the Parties

Akridge appears to make two primary contentions on appeal: first, that were it not for the illegal search, Stewart's existence, and the relationship of the parties to one another, would not have been discovered, and second, even if the identities and the parties were known or would have become known, it does not necessarily follow that Ellison and Stewart would have offered incriminating statements and trial testimony against Akridge were it not for the illegal May 2000 search.

As to the former assertion, Akridge's arguments focus primarily on Stewart. Akridge argues that unlike Ellison, Stewart was not known to investigators prior to the illegal search, and although Stewart lived with Ellison, "that fact alone does not demonstrates [sic] that she or her testimony would have been inevitably discovered but for the illegal

---

[6]This list of factors is neither exclusive nor exhaustive, and clearly not all factors may be relevant to every situation.

search on May 2, 2000." Appellant's Br. at 16-17, 23. Akridge further argues that "[b]ut for the May 2 search, [Stewart's] relationship to Akridge may not have been discovered." Appellant's Br. at 25.

In addressing these contentions, we find crucial the time line relating to events surrounding the May 2000 search. According to Appellant's own recitation of facts, upon arrival at the 824 Arlington Avenue residence, Chattanooga police officers Darrell Turner and Anthony Sutton knocked at the door, spoke with Akridge, and requested consent to search. In response to this request, Akridge announced that he would first have to speak with Ellison and Stewart because their names were on the apartment lease. Akridge then went inside the apartment and asked Ellison and Stewart to step outside to speak with officers. Akridge and Ellison apparently proceeded outside to the yard to speak with the officers, while Stewart remained in the apartment doorway. During the ensuing conversation, all three residents gave verbal consent to search the apartment. However, such consent was purportedly based on false representations by Turner that he had specific information regarding two kilograms of cocaine in the residence and that "the Feds were around the corner and . . . had a search warrant."

Based on the foregoing, it is clear that at the moment Akridge opened the door and identified himself as an occupant of the apartment and further identified his roommates as Ellison and Stewart, his identity and a relationship to Stewart and Ellison were established, independent of the illegal search. Chattanooga police officers were legitimately responding to an anonymous tip regarding drug sales originating from Akridge's apartment, and there is no assertion that the apartment's occupants were lured or otherwise illegally compelled outside the apartment to discuss the issue of consent to search.

Although Akridge argues strenuously that his connection to Stewart and Ellison would have remained unknown were it

not for the subsequent illegal search, this argument ignores the fact that the identities of Ellison and Stewart and their status as occupants of the apartment whose consent was needed prior to search, were made known to the police officers *prior* to any asserted illegality.[7] Notwithstanding the fact that the parties have not specifically addressed whether the witnesses' identities, as opposed to their testimony, are separately suppressible, we find that the Government's knowledge of the existence of Akridge, Ellison, and Stewart and their relationship to one another as roommates, arises from no illegality and thus does not implicate the exclusionary rule.[8]

### F. Testimony

Regarding the actual statements and trial testimony offered by Ellison and Stewart, Akridge appears to contest on appeal

---

[7] In reasoning that police knew of the link between Stewart, Ellison, and Akridge only via the illegal search, the dissent ignores the timeline which we have gone to lengths to set forth. As noted *supra*, *prior* to the illegal entry, Akridge informed officers that he needed to talk to his roommates, Ellison and Stewart, and asked them to step outside. At this point in the sequence of events, even if officers had walked away from the scene without illegally entering the apartment, they would have known of Stewart and Ellison and would have known that they were all living together in an apartment from which drugs allegedly were being sold.

[8] Even assuming some illegality, Akridge's "but for" argument fails. Under *Ceccolini*, the mere fact that an illegality is a "but for" cause of disputed testimony is insufficient to warrant exclusion. *See Ceccolini*, 435 U.S. at 276 ("Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.").

As to the discovery of the parties' relationship to one another as drug dealers, as opposed to merely roommates, this information came to light not only through the evidence found at the apartment, but also from statements made by the parties during questioning and at trial. We address Akridge's objections to these statements *infra*.

the statements made during the course of three separate events, *i.e.*, the June 19 interviews, the preparation of Ellison's and Stewart's affidavits used to oppose Akridge's enlargement motion,[9] and the trial testimony offered by Ellison and Stewart. The chain of causation Akridge attempts to establish is that the May 2000 search led to the June interviews during which certain statements were made, resulting in the parties' arrests, leading to Ellison's and Stewart's plea agreements, which in turn required Ellison's and Stewart's cooperation in future investigations and prosecutions,[10] thus resulting in Ellison and Stewart testifying for the prosecution at Akridge's trial.

Akridge's general argument is that every statement made after the May 2000 search is tainted and thus should be suppressed. Akridge further argues that the affidavits and testimony "do not reflect what the respective position of each witness would have been the instant before the illegal May 2 search." Appellant's Reply at 6. Akridge therefore reasons that the Government cannot establish that the incriminating information about Akridge contained in the affidavits and testimony would have been inevitably discovered.

As to the factors set forth above, we find most dispositive the degree of free will exercised by Ellison and Stewart, as well as the temporal attenuation between the May search, the

---

[9]These affidavits set forth Ellison's and Stewart's reasons for entering into plea agreements.

[10]Ellison's plea agreement is part of the record on appeal and clearly contains a cooperation provision. Stewart's plea agreement is not included in the joint appendix, but the Government does not dispute the assertion that pursuant to her plea, Stewart was obligated to provide trial testimony against Akridge.

---

June questioning, and the subsequent plea agreements and trial testimony.[11] These factors are discussed further herein.

With respect to the purpose and flagrancy of the police misconduct, Akridge asserts that the sole purpose of the May 2 search was to uncover evidence of drugs. Certainly, a clear intent to uncover illegality though illegal means would seem to weigh in favor of suppression. However, we note that the police were not specifically in search of the particular evidence sought to be suppressed in this case, *i.e.*, witness testimony.[12] Instead, officers were responding to a complaint about drug trafficking from Akridge's apartment. Moreover, while the case for suppression is clearer for any tangible evidence seized during the search, the Supreme Court has instructed that "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Ceccolini*, 435 U.S. at 278.

As to the role that any illegal fruits from the May 2000 search played in obtaining Stewart's and Ellison's testimony,

---

[11]We do not find as critical the time elapsed between trial and original contact with the witnesses in this case, for while a year elapsed between trial and the May 2000 search, Stewart and Ellison were obligated as part of their plea agreements to assist in the Government's investigation and prosecution of others. Therefore, as of the entry date of their plea agreements, Ellison and Stewart were essentially bound by their pleas to offer testimony at Akridge's trial. Nonetheless, we note that approximately eight months transpired between the search and actual entry of Stewart's plea and five months between the search and Ellison's plea.

[12]As noted in *Ceccolini*, the analysis might differ "where the search was conducted by the police for the specific purpose of discovering potential witnesses." *Ceccolini*, 435 U.S. at 277 n.4. The Court noted that there was "not the slightest evidence to suggest that [the officer] entered the shop . . . with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing witness to testify against respondent." *Id.* at 279-80.

we find it beyond dispute that the threat of prosecution played *some* role in their decision to submit to questioning in June, as well as their ultimate decisions to enter into plea agreements. Even though the Government asserts that no references were made during questioning to the evidence seized during the May search, this assertion loses some significance in light of the fact that Stewart and Ellison were co-defendants, Stewart had been taken into custody, and both parties knew, even if evidence was not referenced during questioning, that they were facing prosecution. Nonetheless, despite the foregoing circumstances, we find that temporal attenuation, as well as the degree of free will exercised by Ellison and Stewart, weigh in favor of affirming the district court's decision to deny Akridge's suppression motion.

### 1. Ellison

Regarding the June 19 interview, on that day officers returned to the Arlington Avenue residence to further question Stewart. Akridge and Ellison initially indicated that Stewart was not at home, but eventually went inside the residence to summon Stewart. Affidavits indicate that a crowd was gathering outside the apartment, so the officers thought it would be safer to conduct the questioning at the police station and requested that Akridge, Ellison, and Stewart all come in for questioning. As recounted by Akridge, Agent Malone "invited Akridge and Ellison to meet with officers at the police station to discuss the May 2 search of their apartment and Stewart's arrest. The three cooperated and admitted to selling crack cocaine and marijuana." Appellant's Br. at 10.

Per police procedure, Akridge, Stewart, and Ellison were handcuffed during transport to the police station, but were not handcuffed during their interviews. All three parties signed a waiver of rights, admitted to various drug and weapons related incidents, and ultimately were arrested.

Akridge emphasizes that it was not until after the June arrest that Ellison made the "final decision" to plead guilty and "turn his life around." However, in the affidavit presented at the second suppression hearing, Ellison states that the reason for his decision was that he was facing exposure to enhanced sentencing as a career criminal under 18 U.S.C. § 924(e) due to the January 1999 firearms charge and that this charge was "a major factor" in his decision to enter a plea. Ellison also explained that he knew he had been a poor role model for his son by getting caught up in selling drugs and wanted to serve his time to "be a good example for [his] son." Ellison's affidavit further reflects that in deciding to cooperate, Ellison knew that he would have to disclose Akridge's and Stewart's involvement with guns and drugs, but having made the decision to cooperate, he "could not do it half way." Based on this decision, Ellison testified favorably for Akridge at the suppression hearing but offered testimony against Akridge at trial.

Although Ellison's direct relationship with Akridge may not have been revealed until May 2000, it is undisputed that Ellison was facing prosecution as a career offender. While Ellison appeared for questioning at the Government's behest, he did so voluntarily and without coercion.[13] It was several months thereafter, in October, that Ellison entered into a plea agreement, an agreement that required Ellison's cooperation with future investigations and resulted in Ellison's trial testimony against Akridge.

We find that the foregoing supports the conclusion that Ellison's cooperation and trial testimony resulted from an

---

[13]Though, as noted by the district court, Ellison and Stewart "were picked up and interviewed by law enforcement, rather than coming forward wholly on their own," J.A. at 165, and while Ellison, Stewart, and Akridge were handcuffed during transport to the police station, the officers made clear that none of the parties were under arrest. The handcuffs were removed at the station, and upon arrival all three executed a waiver of rights prior to issuing statements and confessions.

exercise of Ellison's free will, and was the "product of detached reflection and a desire to be cooperative." *Ceccolini*, 435 U.S. at 277. Admittedly, this is not as clear a case as in *Ceccolini*, in which the witness was not a putative defendant, and Akridge asserts that due to their impending prosecutions, Ellison and Stewart were faced with a Hobson's choice that cannot fairly be regarded as a product of their free wills. However, *Ceccolini* instructs:

> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses–even putative defendants–from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the word of Professor McCormick, "serious obstructions to the ascertainment of truth"' accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954). [* * *] For many of these same reasons, the Court has also held admissible at trial testimony of a witness whose identity was disclosed by the defendant's statement given after inadequate *Miranda* warnings. *Michigan v. Tucker*, 417 U.S. 433, 450-451 (1974).

*Ceccolini*, 435 U.S. at 277-78.[14]

---

[14]Emphasizing the benefit gained by Stewart and Ellison, *i.e.*, reduced sentences in exchange for their cooperation, and their status as co-defendants, the dissent discounts any possibility that the witnesses could have entered plea agreements and offered testimony against Akridge of their own free will. However, under the rationale espoused by the dissent, it is difficult to imagine any scenario under which a co-

Based on the foregoing, and in light of (1) the Government's prior knowledge of Ellison and his criminal background;[15] (2) the six week lapse between the illegal search and the June questioning and arrest; (3) the additional nearly four month lapse between the arrest and Ellison's decision to cooperate; (4) Ellison's stated willingness to testify, particularly his cited reasons for deciding to turn his life around; and (5) the significant impact of Ellison's

---

defendant witness would be permitted to testify where the co-defendant's identity was initially discovered by an illegal search. The dissent's position would invariably preclude the testimony of all such co-defendants that have entered plea agreements, merely by virtue of the benefit received and the witnesses' status as co-defendants. Notably, this is the precise outcome expressly rejected by *Ceccolini*, *i.e.*, the perpetual disablement of witnesses, even co-defendants, from testifying. Post-*Ceccolini*, courts have consistently rejected the notion that *Ceccolini* applies only to the disinterested, non-party, civic minded witness and have instead applied the case to co-defendants' testimony under various factual circumstances. *E.g.*, *United States v. Padilla*, 960 F.2d 854, 863 n.7 (9th Cir. 1992), *rev'd on other grounds*, 508 U.S. 77 (1993) ("This court has never adopted a per se rule limiting *Ceccolini* to 'good citizen' witnesses who testify 'out of a sense of civic duty'"); *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980) (deeming admissible testimony of coconspirator "confronted with the fruits of the illegal search at the time his cooperation was first solicited[,]" though witness was facing substantial jail time for another crime, testified pursuant to a plea bargain, and viewed by court as likely testifying out of self-interest); *United States v. Brookins*, 614 F.2d 1037, 1043 (5th Cir. 1980) (testimony partially induced by a grant of immunity); *United States v. Stevens*, 612 F.2d 1226, 1229-30 (10th Cir. 1979) (deeming admissible testimony from coconspirator who testified pursuant to plea bargain, reasoning that witness "was entitled to raise the defense of the illegality of the wiretaps and the inadmissibility of evidence resulting therefrom in the case against him[,] [b]ut he offered to testify; his statement declared this decision was in part motivated by a desire 'to change his life-style and stay out of trouble.'").

[15]We also find it of note that not only Ellison, but also Akridge, were already known drug dealers. Ellison was under investigation and about to be prosecuted in connection with the 1999 search. Akridge was a prior offender and the affidavit testimony of Agent Malone reflects that he had been receiving updates on Akridge's criminal activities.

impending prosecution and eligibility for a career offender enhancement relating to the January 1999 charges, we find that the connection between the illegal search and the testimony is sufficiently attenuated. *See United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980) (finding it likely that the witness' decision to cooperate was based on the strong possibility of substantial jail time in relation to committing a crime separate from that at issue on appeal). In making this determination, we find instructive *Wong Sun*, in which Wong Sun's arrest was deemed illegal due to lack of probable cause or reasonable grounds. Nonetheless, the Court regarded this antecedent illegality to be of no evidentiary consequence, because Wong Sun had been arraigned, released on his own recognizance, and had returned voluntarily several days later for interrogation, during which he made the contested statement. The Court determined that based on the foregoing, "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" *Wong Sun*, 371 U.S. at 491 (quoting *Nardone*, 308 U.S. at 341).

### *2. Stewart*

As to Stewart, Akridge argues that "[e]ven if a relationship had been discovered, Stewart would have had no incentive to offer testimony against Akridge absent the arrest stemming from the May 2 search." Appellant's Br. at 25-26. Akridge further submits that "[i]t is illogical to assume that it was an exercise in free will that caused [Stewart] to plead guilty and cooperate when all evidence against her could have been suppressed." Appellant's Br. at 18. We draw the opposite conclusion.

As with Ellison, Stewart voluntarily returned to the station for questioning. Notably, Stewart entered her guilty plea on January 5, 2001, *after* the magistrate recommended that the court grant Akridge's motion to suppress all physical evidence seized, as well as Akridge's statement, in relation to the May 2000 search. Via affidavit Stewart averred that she knew she could attempt to suppress the firearms seized on

May 2, 2000 but did not wish to do so due to a desire to cooperate and tell the truth. Despite a potentially favorable suppression ruling, Stewart still decided to enter a guilty plea instead of challenging the evidence against her. Had Stewart's motivation been solely to avoid prosecution, she could have waited for a suppression ruling. Instead, Stewart entered her plea without challenging the admissibility of the evidence against her.

As to the earlier statements made on June 19, we note that unlike Akridge and Ellison, Stewart had been previously in custody in relation to the events about which she was being questioned. However, neither Stewart nor Ellison were "continuously detained and questioned by the police" until giving their statements mere hours after the illegality. *United States v. Ienco*, 182 F.3d 517, 531 (7th Cir. 1999).[16] Instead,

---

[16] Citing *United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999), the dissent posits that "other circuits have unflinchingly rejected the majority's position." However, *Ienco* does not stand in contradiction to our holding and is clearly distinguishable, in that the contested witness' statements "were made at 4:15 a.m. after he had been in custody and questioned at the police station for almost eleven hours." *Ienco*, 182 F.3d at 530. The witness was not "Mirandized," nor did he have an attorney present during questioning. And, as stressed by that court, the "subsequent confession and trial testimony were made after Judge Duff denied the motion to suppress." *Id.* Faced with what the court characterized as "the choice between testifying against Ienco . . . or going to trial where tainted and incriminating evidence would be used against him, Iovine chose to testify." *Id.* Here, the parties submitted to questioning after executing waivers, entered pleas well-after the initial illegality, and did so in the face of a potentially *favorable* suppression ruling.

*United States v. Padilla*, 960 F.2d 854 (9th Cir. 1992), *rev'd on other grounds*, 508 U.S. 77 (1993), also cited by the dissent as repudiating our free will analysis, is similarly distinguishable. In *Padilla*, the discovery of drugs and the questioning of the testifying party "were virtually simultaneous events," "the identities of the defendants would not have been known without the seizure and subsequent questioning," and there was "no indication that the informant would have come forward of his own accord." *Padilla*, 960 F.2d at 863. As noted *supra*, the plea agreements here were entered months after the illegal search, the

after her initial arrest in May, Stewart was released and was voluntarily questioned six weeks later in June. As with Ellison, we find instructive *Wong Sun*, in which the Court determined that a matter of days was sufficient to purge the taint of the illegality, and conclude that the connection between the illegal search and Stewart's subsequent statements was "so attenuated as to dissipate the taint."

In so ruling, we are mindful of the Supreme Court's repeated admonition that the exclusionary rule is not a per se rule; rather, the rule is to be applied only in those instances where exclusion would result in the appropriate deterrent effect.

> "[W]e have declined to adopt a 'per se or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978). Rather, in this context, we have stated that "[t]he penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *Id.*, at 279.

*New York v. Harris*, 495 U.S. 14, 17 (1990). We are also mindful of the Court's admonition that "[t]he exclusionary rule should be invoked with greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *Ceccolini*, 435 U.S. at 275. In this case, we determine that the statements and trial testimony of Ellison and Stewart were procured through means sufficiently

---

existence and identities of Stewart and Ellison were made known *prior* to the illegal search, and the record is completely devoid of any evidence to justify the dissent's supposition that the affidavits were executed under threat of revocation of the plea agreements.

distinguishable from the illegal search as to be purged from the primary taint. *See Wong Sun*, 371 U.S. at 487-88.

### III.  CONCLUSION

Based on the foregoing, we AFFIRM the judgment of the district court.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. On May 2, 2000, police officers approached an apartment where the defendant Stephen Akridge was living together with Kevin Ellison and Tiffany Stewart. The police flatly and repeatedly lied to Akridge to persuade him to let them search the apartment, rendering the search undisputedly unconstitutional. In the illegal search, the police seized significant quantities of crack and marijuana, as well as several firearms. On June 20, 2000, Ellison, Stewart, and Akridge were arrested and charged. One week later, on June 27, 2000, Stewart entered into a plea agreement with the government. Akridge and Ellison both moved to suppress the search. While their motion was pending, however, Ellison entered into a plea agreement with the government in October of 2000, waiving the suppression issue and leaving Akridge to litigate it on his own. Eventually, on January 22, 2001, the district court ordered the physical fruits of the search suppressed. Without this physical evidence being directly admissible, the prosecution used Ellison and Stewart to establish its existence indirectly, through testimony. On the basis of their testimony, Akridge was convicted.

The majority concludes that Ellison's and Stewart's testimony was admissible against Akridge, in spite of the fact that it was the fruit of the illegal search. It argues that their testimony was sufficiently "attenuated" from the illegal search as to fall within the exception to the fruit-of-the-poisonous-tree doctrine under *United States v. Ceccolini*, 435 U.S. 268 (1978). After analysis, I must disagree.

Any discussion of the "attenuation" doctrine must begin with an analysis of *Ceccolini* itself. In *Ceccolini*, the FBI was investigating suspected gambling operations in New York. The defendant's flower shop was one of the places under surveillance. One year after surveillance ended, a local police officer, Ronald Biro, spent his break casually talking with his friend Lois Hennessey, who was working at the shop. During the conversation, Biro picked up an envelope lying on the drawer of the cash register and discovered that it contained money and policy slips. Without telling Hennessey what he had seen, he asked her to whom the envelope belonged. Hennessey explained that it belonged to the defendant, Ralph Ceccolini. Biro mentioned this to another local detective, who passed it along to the FBI. Four months later, the FBI interviewed Hennessey at her home and asked for information regarding Ceccolini; the FBI did not mention the earlier incident with Biro at the flower shop. Hennessey, who was studying police science in college, was eager to help. She related to the FBI the events that had occurred during her visit with Biro. When Ceccolini denied before a grand jury that he knew anything about any gambling operations, the government had Hennessey testify in Ceccolini's resulting trial for perjury. The question in the case was whether Hennessey's testimony was admissible, despite the fact that it was clearly, though remotely, derived from an admittedly illegal search — Biro's improper seizure of the envelope and discussion with Hennessey.

The Supreme Court held that Hennessey's later testimony was sufficiently attenuated from the initial illegal search as to be admissible on the basis of five considerations. Most significant to the Court was the fact that Hennessey's decision to talk to the police (and later to testify) was not due to any leverage the police had over her by virtue of the illegal search. The Court stressed that "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.* at 277. This was true in Hennessey's case; her testimony, the Court held, was "in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips." *Id.* at 279. The Court also emphasized, to a lesser degree, four other factors. First, the gambling slips were not used in questioning Hennessey. Second, four months passed

between the illegal search and any subsequent contact with Hennessey, and over a year passed between the latter and Ceccolini's trial. Third, the police knew of Hennessey's relationship with Ceccolini before the illegal search. And lastly, there was no evidence that Biro conducted this illegal search in the attempt to find incriminating evidence. *See United States v. McKinnon*, 92 F.3d 244, 247 (4th Cir. 1996) (using these factors), *cert. denied*, 519 U.S. 1099 (1997); *United States v. Ienco*, 182 F.3d 517, 530 (7th Cir. 1999) (same).

Consideration of the *Ceccolini* factors in this case can lead to only one conclusion — that the testimonial evidence in this case must be suppressed. The first factor, the issue of free will, is the most fatal to the prosecution's case. The majority argues that Ellison's and Stewart's testimony was not a product of any governmental coercion or inducement, but was a product of their own volition. I completely disagree. Ellison and Stewart had just been found with large quantities of drugs and several firearms; the statutory sentencing ceiling for the charges in their initial indictments was life in prison. The government offered Ellison and Stewart the following options in the form of a plea bargain: Testify against Akridge and receive a lighter sentence, or litigate the suppression issue and risk a significantly increased prison sentence. Ellison and Stewart chose the former. Although it is impossible to discern from the record just how much of a lighter sentence Ellison and Stewart received by virtue of their cooperation, it is clear that their sentences were significantly reduced.[1] It

---

[1]Under their plea agreements, Stewart received a 12-month sentence while Ellison (who had a more extensive criminal history and was convicted of several additional charges) received a 115-month sentence. In contrast, Akridge received a 660-month sentence. Given the fact that Akridge had roughly the same role in the alleged offenses as Ellison and Stewart, and received a sentence fifty times more severe than Stewart (and five times more severe than Ellison, who had roughly the same criminal history as Akridge), it seems beyond dispute that Ellison and Stewart both received a significant reduction in prison time by entering into a plea

therefore seems impossible to say that Ellison and Stewart were "in no way coerced or even induced by official authority as a result of [the illegal search]."[2] Such a statement ignores the mutual consideration usually exchanged in plea agreements: the defendants receive lesser sentences and, in return, they testify for the prosecution.

Somehow, the majority refuses to acknowledge these basic facts, pointing to Ellison's and Stewart's affidavits. These affidavits state that Ellison's and Stewart's decisions to testify against Akridge were voluntary, that they wanted to turn their lives around and tell the truth. Of course, there is a gentle irony in these affidavits — namely that the government presumably required Ellison and Stewart to sign these affidavits under threat of revoking their plea agreements. But even assuming that Ellison and Stewart were cooperating in part because they wished to tell the truth, it is clear that they only wished to tell the truth to avoid the effects of the incriminating and illegal search. No one argues the implausible thesis that Ellison and Stewart would have told the truth had they never been found by the police in the illegal search.

---

arrangement with the government.

[2]Because Stewart was unknown as a suspected criminal to the police until the illegal search, all of the charges against her were based on evidence discovered in the illegal search. And although the police had found firearms and marijuana in another of Ellison's residences over a year earlier, Ellison was also charged with several additional crimes as a result of the illegal search. As is explained below, it is therefore clear that the illegal search itself induced (if not coerced) both Ellison and Stewart into entering a plea agreement with the government.

While the majority emphasizes that the bare identities of Stewart and Ellison became known to the police before the unlawful search took place, the difference between knowing the identity of Akridge's roommates and being able to charge them with crimes resulting in years in prison is, to say the least, significant.

Of course, Ellison's and Stewart's decision to plea bargain was "voluntary" in the sense that they did choose to plea bargain over their other alternatives. But that does not make their decision "voluntary" within the meaning of *Ceccolini*, under which we must differentiate between witnesses who testified of their own volition and those that testified because of inducement or coercion on the part of the government.[3] *Cf. United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1397 (9th Cir. 1989) (noting that the key inquiry is whether the "witnesses would have come forward of their own volition to inform officials"). In *Ceccolini*, the witness was a civic-minded citizen, "not a putative defendant," *Ceccolini*, 435 U.S. at 275, who studied police science and was eager to help the government. The government offered no benefit in return for her testimony, and threatened no detriment if she failed to provide it. Because her testimony was "in no way coerced or even induced by official authority as a result of [the illegal search]," *id.* at 279, her subsequent testimony was considered attenuated. In contrast, the witnesses here were putative defendants, clearly induced (if not coerced) into testifying under the Damocles-like threat of additional years (or decades, in Ellison's case) in prison. To say that these defendants acted "freely" is to strip all the meaning that the Supreme Court has attached to this phrase. Short of government agents forcing Stewart and Ellison to testify by threats of physical violence, I can think of no situation that would involve less free will than the one here. Accordingly,

---

[3]The majority claims that the position advocated here would lead to a per se rule that was rejected by *Ceccolini* and its progeny. This assertion fails to take account of the particular circumstances that make this case so clearly one in which the taint of illegality has not been attenuated. In no case cited by the majority where the taint has been held to be attenuated has the government's case against a testifying potential codefendant been so wholly and entirely a product of the illegal behavior. The position advocated here does not amount to a per se rule, but instead a recognition that when the free will of a witness has been so obviously affected by the discovery of adverse evidence in an illegal search, it will take an extremely strong showing in the other factors to shift the balance towards attenuation.

I find it unsurprising that other circuits have unflinchingly rejected the majority's position.[4]

Although I believe this consideration so tilts in favor of the defendant that the "attenuation" doctrine is no longer applicable, considerations of the other *Ceccolini* factors also support suppression. First, in *Ceccolini*, "both the identity of

---

[4]In a case similar to the case at bar, the Seventh Circuit held that a putative defendant's decision to enter into a plea agreement that required him to testify against his codefendant was not "free" because his only options were "testifying against [his codefendant] for a lighter sentence or going to trial where tainted and incriminating evidence would be used against him." *United States v. Ienco*, 182 F.3d 517, 530 (7th Cir. 1999). This could not be a free choice, the court stressed, as "his actions appear dictated by his own precarious legal situation–a circumstance forged by the illegal arrest and search." *Id.*

Similarly, in *United States v. Padilla*, 960 F.2d 854 (9th Cir. 1992), *rev'd on other grounds*, 508 U.S. 77 (1993), Luis Arciniega had been illegally stopped and found with hundreds of pounds of cocaine in his car. Arciniega confessed that he was a drug mule and led the police to the heads of the criminal enterprise, including Xavier Padilla. At Padilla's trial, the government argued that Arciniega's testimony was sufficiently attenuated from the illegal stop. The Ninth Circuit flatly rejected the government's argument that Arciniega was testifying of his own free will, recognizing "the heavy weight upon a man's shoulders who has just been arrested with hundreds of pounds of drugs in the car he was driving." *Id.* at 862.

While the majority attempts to distinguish *Padilla* and *Ienco* by asserting that the timing of the witnesses' cooperation is key in determining their free will, it cannot point to any similar case where the testimony of coconspirators under threat of prosecution based primarily or exclusively on evidence seized in an illegal search has been held to be sufficiently attenuated. That Stewart and Ellison surrendered more quickly to prosecutorial pressure than their cognates in *Padilla* and *Ienco* does not serve to demonstrate their free will, but perhaps even more clearly their lack of it.

One commentator, noting the practice of the federal courts generally, remarked that when it "appear[s] that the witness has been pressured and that the pressure is a consequence of the prior Fourth Amendment violation . . . a finding of attenuation is unlikely to be justified." Wayne R. LaFave, 5 *Search And Seizure: A Treatise On The Fourth Amendment* § 11.4 (3d ed. 1996).

Hennessey and her relationship with the [defendant] were well known to those investigating the case" before the illegal search. *Ceccolini*, 435 U.S. at 279. Here, it was the opposite; while the police may have known about Ellison and Akridge separately, nothing even suggested that the two were linked until the police found them together in the illegal search — and the police did not even know Stewart existed at all. Second, in *Ceccolini*, the police never mentioned the earlier search in their subsequent interview with Hennessey and never referred to the illegally seized evidence. *Id.* at 272 (noting that the investigator "did not specifically refer to the incident involving Officer Biro"). Here, Officer Cordell Malone seems to acknowledge that he brought up the initial illegal search with Ellison and Stewart, only testifying that he refrained from asking them leading questions about it. Finally, in *Ceccolini*, Biro entered the flower shop simply to talk with his friend and inadvertently noticed something he never should have seen. Although the search was unconstitutional, it was not done intentionally to find evidence of criminal wrongdoing; there was "not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation." *Id.* at 279-80. In this case, the search was designed to obtain evidence against the defendant — a point so obvious that the government does not bother to dispute it.

In conclusion, all of the *Ceccolini* factors point toward suppression of Ellison's and Stewart's testimony. With Akridge's conviction, the prosecution has successfully managed to escape with the fruits of its poisonous search. What the government could not admit directly because of its flagrant constitutional violations, it has slipped through the back door. I respectfully dissent.