# United States Court of Appeals
## For the First Circuit

No. 03-1643

UNITED STATES OF AMERICA,

Appellant,

v.

ZACHARY PARADIS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, <u>Senior U.S. District Judge</u>]

Before

Boudin, <u>Chief Judge</u>,
Cyr, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

<u>Margaret D. McGaughey</u>, Assistant United States Attorney, with whom <u>Paula D. Silsby</u>, United States Attorney, was on brief for appellant.
<u>William Maselli</u> for appellee.

November 18, 2003

**LYNCH**, **Circuit Judge**.    The government brings this interlocutory appeal, 18 U.S.C. § 3731, from the allowance of a motion to suppress, on Fourth Amendment grounds, a firearm (a .25 caliber Rigarmi semi-automatic pistol), a box of .25 caliber ammunition, a bag of .22 caliber ammunition, and statements made by the defendant, Zachary ("Pee Wee") Paradis, after he was arrested and had received Miranda warnings.  See United States v. Paradis, No. CRIM. 02-78-P-C, 2003 WL 1960594 (D. Me. Apr. 25, 2003) (adopting the recommended decision of the magistrate judge reported at 2002 WL 31989385 (D. Me. Feb. 10, 2002)).

The case raises issues about the defendant's ability to establish a Fourth Amendment interest in seized weapons, the limits on the government's ability to rely on the "protective sweep" doctrine, and the reach of the attenuation doctrine under the Fourth Amendment.  We affirm the suppression of the firearm on the grounds reached by the district court, remand on the unreached ground, and reverse the suppression of the two groups of ammunition and the statements.

In brief, police officers armed with a warrant entered the apartment of Danyelle Bell in Auburn, Maine on June 24, 2002 in search of her former boyfriend, Paradis, who was wanted on state arrest warrants.  After the defendant had been arrested and removed from the apartment, an officer moved the mattress of a child's bed, causing a pile of clothes and toys to fall and uncovering a pistol,

-2-

which he then seized.  On June 30, five days after the arrest, an officer interviewed Bell in response to her report that Paradis, who had been released on bail, had stolen her car.  During that interview and a later one, Bell was asked if she knew anything about the seized pistol.  She linked Paradis to the pistol and to some ammunition in her apartment and on a back porch of the building.  The defendant was arrested again under state law and was ultimately charged with the federal crimes of being a felon in possession of a firearm and ammunition, 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with possessing a firearm with an altered serial number, 18 U.S.C. §§ 922(k) and 924(a)(1)(b).  Paradis then made statements to the police regarding the pistol and the ammunition.

**I.**

We describe briefly the facts as found by the magistrate judge and adopted by the district court judge, and supplemented from the record.  We review the findings of fact for clear error and the ultimate Fourth Amendment conclusions de novo.  Ornelas v. United States, 517 U.S. 690, 699 (1996).

As of June 24, 2002, three active state arrest warrants for the defendant were outstanding, one arising from his domestic assault of Danyelle Bell and the other two from his failure to appear on two different charges -- operating a vehicle after license suspension and failing to stop for a police officer.  At about 11:15 p.m. on that date, Auburn police officers Prince and

-3-

Harrington went to an apartment known to be the apartment of the defendant's girlfriend, Danyelle Bell. The apartment was on the second floor, and there were only two apartments on that floor. The officers heard the voices of several men through the door of the apartment. They knocked. A female voice asked who was there. Harrington announced that it was the police department. The officers could hear rustling in the back of the apartment. Bell came to the door and opened it only far enough for the officers to see her. They asked if Paradis was there; she said that he was not, but she appeared nervous. She said that she had last seen him about a month earlier, which the officers knew to be untrue because she had twice called the police in June with complaints about him. Bell stated that her new boyfriend was there; Harrington asked to have him come to the door. Bell called to the back room for "Josh" to get dressed and come to the door.

Joshua Benning appeared and said that he did not know the defendant. Harrington asked Bell if he could go into the apartment to look for Paradis in light of her prior repeated calls to the police and her relationship with Paradis.[1] Then Malon Bean came to the door and told Harrington that Bell was "his girl" now, that Paradis was not there, and that the officers would not be allowed

---

[1] On June 6, 2002, Bell had called the police and reported that Paradis was "flipping out" at her apartment. On March 30 and June 3, 2002, Paradis had assaulted Bell. Bell again called the police approximately two weeks after the June 3 assault and reported that Paradis had taken her car.

to enter. While Bell, Benning, and Bean were at the door, the officers could still hear rustling in the back room of the apartment. At some point, Bell told the officers that her four-year-old child was not at home.

Lieutenant Roth arrived and told Bell that if Paradis were found in her apartment, she could be charged with harboring a fugitive. Bell appeared to grow more nervous. The lieutenant asked Bell to go into the apartment and ask Paradis to come out. Bell went inside. About five minutes later, Benning left the apartment; he was followed a few minutes later by Bell and Bean. Bell locked the door behind her. Harrington told Bell that the police would seek a search warrant.

The police could still hear rustling sounds from the back room of the apartment. The police were not aware of any pets, and they knew that the three people had left and the child was not there. One officer remained at the apartment with a clear view of its doors while others went to get a warrant. No one entered or left the apartment until the police came back after midnight with the warrant. The warrant authorized a search only for Paradis' person.

The police knocked and announced, warrant in hand, but no one answered. The police then forced entry into the apartment. The officers moved through the rooms searching for the defendant in roughly the following order: living room, small kitchen, back

through the living room, small bedroom, small bathroom, then back into the bedroom.  The officers found no one, and there were no other rooms in the apartment.  Officer Roth had noticed ammunition on the entertainment center in the living room and had commented on it to the other officers.  In the bedroom for the second time, the officers looked around and moved things.  They lifted up the mattress and box spring "because that would have been the only logical place someone would have been able to hide," and found the defendant lying beneath it.  They arrested and removed him.

After Paradis was found, Officer Roth remained in the bedroom and gave instructions to do a quick sweep of the "area where the defendant had been removed from."  Paradis was handcuffed either then or on the way out.  The officers did a "small sweep," moved some things around, and moved the bed to see if the defendant had hidden anything while underneath it.  They found nothing on this sweep.

As the defendant was in custody and leaving the apartment, Officer Prince, who had been waiting outside during the initial search for Paradis, came upstairs to the apartment, passing Paradis at the apartment door, and entered the living room.  Prince did not hear Roth's instructions to perform a sweep, which may have been given before Prince arrived.  Officer Prince went to the bedroom and saw Officer Bouchard in the far corner of the room looking around and trying to make his way out.  He walked into the

room and was told by Officer Bouchard that the defendant had been found under the bed. Officer Prince then slid the mattress of a child's bed back onto its frame. He said he did so because otherwise there would not have been enough room to pass.[2] When he slid the mattress, a pile of clothing fell to the ground and he saw the handle of a pistol underneath "Tigger," a child's stuffed animal. Officer Prince seized the gun. He estimated that he found the gun about a minute and a half after he heard the radio report that Paradis had been arrested. There was no evidence regarding how long after the Paradis arrest that radio report was made.

On the night of June 30, 2002, Officer Hatfield, who had been informed of, but was not involved in, the defendant's arrest, responded to a report by Bell that her car had been stolen. Bell told Hatfield that Paradis, who was out on bail, had stolen the car. During their conversation, Hatfield asked Bell if she knew anything about the firearm found on June 25. Bell said that the gun belonged to the defendant, who had brought it into her apartment. Officer Hatfield did not know that ammunition had been observed in the apartment on June 25. Bell then gave him a yellow box of .25 caliber ammunition which she said belonged to Paradis. She stated that there was also a bag of ammunition belonging to

---

[2] The defendant contested this explanation, claiming that the mattress would have to be lifted out of the frame of a child's bed with side rails (like a crib) and could only have been done deliberately as part of a search. The magistrate judge did not resolve this dispute.

Paradis on the back porch of the first floor level of the apartment house. She pointed out the bag to Hatfield, who picked it up. It contained .22 caliber ammunition. On July 1, 2002, Officer Hatfield again interviewed Bell, this time at the police station, and they discussed the gun and ammunition further. Among other things, Bell recounted how she had purchased the wrong caliber ammunition, the .22 caliber, for Paradis, and how Nicole Boutot, a neighbor, had told her that Paradis had brought the .22 caliber ammunition to Boutot's apartment, promising to come back to get it but never doing so. Boutot later put the ammunition on the downstairs porch of Bell's apartment building.

On July 3, 2002, the defendant, who had been released on bail after the June 25 arrest, was again arrested pursuant to a state arrest warrant. Paradis was advised of his <u>Miranda</u> rights, and, after being reminded that he did not have to speak to the police, agreed to answer questions. During the ensuing police interview, he told police that he had lived with Bell at the apartment since his release from prison approximately seven months earlier. Paradis stated that he had bought the .25 caliber pistol for Bell about a month earlier and that the gun was delivered to the apartment by the seller. He said that a neighbor, Jody Green, bought ammunition for the gun about two weeks after its purchase, and he stated that the gun was working because someone had fired it in his presence. When asked whether his fingerprints would be

found on the gun, Paradis said that they might, because he had shown Bell how to load it.[3]

## II.

## A. The Suppression of the Gun

On appeal, the government argues that the gun should not have been suppressed because the defendant had no Fourth Amendment interest in the apartment or the gun, and alternatively, because the gun was seized in plain view during a valid protective sweep of Bell's apartment that was conducted shortly after the defendant was found.[4]

### 1. Paradis' Protectible Fourth Amendment Interest

The district court held that Paradis had a reasonable expectation of privacy in the apartment and could assert a claim of violation of Fourth Amendment rights in the seizure of the gun. The government argues that this holding was error.[5]

---

[3] The serial numbers on the gun were scratched, and a stamp on the gun read "Made in Italy."

[4] On appeal, the government has abandoned the argument it made to the district court that the seizure of the gun could be justified under the search incident to arrest doctrine. The government was correct to abandon the argument. There is no evidence that the gun was close at hand to the defendant. Indeed, the police searched under the bed where Paradis had been hiding and found no weapon.

[5] The government's argument on this issue is far from clear and comprises just one sentence: "First, as even the Magistrate Judge acknowledged, it was by no means clear that Paradis had a Fourth Amendment interest in the gun or the bed where it was seized."

The Supreme Court has suggested moving away from analyzing a defendant's Fourth Amendment interest as a separate issue of "standing."  As the Supreme Court explained in Minnesota v. Carter, 525 U.S. 83 (1998), "the definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id. at 88 (citing Rakas v. Illinois, 439 U.S. 128, 140 (1978)). Whatever the label for the analysis, we agree with the district court's conclusion that Paradis sufficiently asserted a Fourth Amendment interest in the apartment and in the gun.

The record shows that Paradis had lived with Bell in the apartment since April 2002, at least when they were not fighting, and that he kept his possessions there.  As such, he had a reasonable expectation of privacy in the apartment and could object to the continuing search of his residence, even if it was also Bell's primary residence.  See Bumper v. North Carolina, 391 U.S. 543, 548 n.11 (1968).  The apartment was his home at the time of the search, and he was entitled to Fourth Amendment protection of his home.

If an initial entry is unlawful, then a "defendant [with an established Fourth Amendment interest in the premises searched] need not also show an interest in the particular item seized." Alderman v. United States, 394 U.S. 165 (1969); 5 W. LaFave, Search and Seizure § 11.3(a) (3d ed. 1996).  Here, though, the initial

-10-

entry was lawful, so Paradis has the burden of showing that he had a protectible Fourth Amendment interest in the gun. See LaFave, supra, § 11.2(b) (explaining that federal courts follow the rule that "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof").

The district court correctly determined that Paradis has established a Fourth Amendment interest in the gun. He purchased the gun, directed the purchase of ammunition for it, test fired the gun, and kept it in his home. The district court appropriately characterized the defendant's testimony regarding his ownership of the gun as "less than uniform." 2002 WL 31989385, at *9. But the defendant did not disavow any ownership or control of the gun, and his testimony was certainly sufficient to allow him to assert a protectible interest in it. The mere fact that he claimed to have bought the gun as a gift for Bell does not, by itself, work to extinguish his Fourth Amendment interest.

2. The Protective Sweep

We review de novo the legal question whether the seizure of the gun violated the Fourth Amendment. United States v. Charles, 213 F.3d 10, 18 (1st Cir. 2000).

The defendant contends that the government's protective sweep argument should be deemed waived because it was not raised in the district court. The defendant correctly observes that the government never argued the protective sweep doctrine to the

-11-

district court and instead urged that the search of the apartment be analyzed under the plain view and search incident to arrest doctrines. The changing of grounds twixt trial court and appeals court is a risky tactic by any litigant, including the government.[6]

What saves the issue for the government is that the magistrate judge, following up on the government's citations to In re Sealed Case, 153 F.3d 759 (D.C. Cir. 1998), made in support of the government's search incident to arrest argument, discussed both the search incident to arrest and protective sweep holdings of that case. 2002 WL 31989385, at *7. More significantly, the magistrate judge applied the protective sweep doctrine to the facts here:

> The court [in In re Sealed Case] . . . held that the search of the first bedroom was incident to arrest because the area searched was reasonably accessible to the defendant at the time of the search. It upheld the search of the second bedroom as a protective sweep

---

[6] When questioned by this court about its failure to raise the argument below, government counsel pointed to its citations to In re Sealed Case, 153 F.3d 759 (D.C. Cir. 1998), in its three district court briefs. However, In re Sealed Case is not just a protective sweep case; one search at issue in the case was upheld as a proper search incident to arrest and another search was upheld as a proper protective sweep. 153 F.3d at 767-70. All of the government's citations to In re Sealed Case were contained in its discussions of the search incident to arrest doctrine and were accompanied by a jumpcite to a single page in In re Sealed Case that discusses only the search incident to arrest doctrine. Without more, we would find the protective sweep argument waived. Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir. 2003) ("[A] litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal," and "[p]assing reference to legal phrases and case citation without developed argument is not sufficient to defeat waiver.") (internal quotation marks omitted).

because it was an area immediately adjoining the place of arrest from which an attack could immediately be launched.  In [Paradis], the bedroom was not reasonably accessible to the defendant at the time of the search and there is no evidence that could possibly support a conclusion that an attack against the officers could immediately be launched from that room.

Id.  Because the magistrate judge ruled on the protective sweep doctrine despite the government's failure to expressly make the argument, and the district court adopted the rulings of the magistrate judge, we reach the protective sweep issue.

We agree with the district court's conclusion that the search that uncovered the gun was not part of a valid protective sweep.  In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court held that "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  Id. at 327.  A protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," id., and can last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," id. at 335-36.  A protective sweep is justified "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others."  Id. at 327

-13-

(internal quotations and citations omitted); <u>Crooker</u> v. <u>Metallo</u>, 5 F.3d 583, 584 (1st Cir. 1993).

The government's protective sweep argument fails because the officers had no reason to believe that there might be an individual posing a danger to the officers or others; to the contrary, they had searched the apartment and had only found Paradis, who was already in custody at the time of the search at issue.[7] <u>Cf.</u> <u>United States</u> v. <u>Irizarry</u>, 673 F.2d 554, 559 n* (1st Cir. 1982) (suggesting, before <u>Maryland</u> v. <u>Buie</u>, that a search for weapons would not be justified where all persons in a hotel room were under police control and the police knew that no other person would be in the room). The police knew that Bell, Benning, and Bean were not in the apartment because they had seen them leave and had an officer posted at the door at all relevant times. They also knew that Bean's child was not present. No one answered the door when they returned with a warrant.

There was no reason to think that there was another person besides Paradis in the small apartment. At the time the gun was found, the police had already been through the entire

---

[7] Thus, this case is unlike a situation in which the defendant has not yet been found and also unlike a situation in which the police believe that a specific individual other than the arrestee is present and dangerous. <u>See</u> <u>Crooker</u> v. <u>Metallo</u>, 5 F.3d 583, 584-85 (1st Cir. 1993). In either of those different situations, the police would be justified in searching for weapons within the easy reach of a hidden individual whom they have reasonably concluded is present and dangerous. <u>See</u> <u>id.</u>

-14-

apartment.  They had been through the living room at least twice (and one or two officers remained there doing paperwork).  And they had been through the only bedroom of the unit twice, finding Paradis on the second hunt and conducting a sweep of the room immediately thereafter.  It was on the third police entry into the bedroom, by Officer Prince, that the gun was found.  Furthermore, by their own testimony the police established that the only logical place someone could hide in the bedroom was under the bed, where they found Paradis.

The government argues on appeal that "at the time the officers found the gun, they had not determined with certainty that Paradis was the only person within the apartment."  That assertion is unsupported by the record and is also contrary to the magistrate judge's determination that "there is no evidence that could possibly support a conclusion that an attack against the officers could immediately be launched from [the bedroom]."[8]  2002 WL 31989385, at *7.

It is important that the government did not have a search warrant for anything other than Paradis' person; once it was clear that Paradis had been removed and there was no threat to the

---

[8]    There is no indication that the magistrate judge analyzed the protective sweep doctrine as being confined to the room in which a defendant is found; the doctrine is plainly not so limited. The magistrate judge's specific reference to the bedroom in the quoted language was a comment on the evidence of record.

officers or others,[9] there was no justification under the protective sweep doctrine to continue the search.[10]

The government implicitly argues that this court should expand the protective sweep doctrine, go beyond Maryland v. Buie, and countenance the continuation of searches in situations such as this one, where there is no reasonable basis to conclude that there was a risk to officers or others. The government refers to a Ninth Circuit case, United States v. Hudson, 100 F.3d 1409 (9th Cir. 1996), and its progeny. There is language in Hudson that could be read to support the government's proposed expansion of the protective sweep doctrine. But it is questionable whether the

---

[9] The government does not even argue that there was a possible threat to others that justified Officer Prince's search under the protective sweep doctrine or under another doctrine, cf. New York v. Quarles, 467 U.S. 649, 655-56 (1984) (holding that "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence").

[10] The government also wisely does not argue that the presence of ammunition in the living room warranted the protective sweep. The apartment belonged to Bell, the ammunition was not hidden, and ownership of ammunition is not illegal except for a convicted felon.

-16-

Ninth Circuit meant to support such an expansion.[11]  In any event, we reject the government's argument.

This leaves one loose end.  The magistrate judge did not determine a material factual dispute.  It is still possible that if Officer Prince was legitimately in the bedroom and did move the small mattress only because he needed to do so in order to pass, then the disclosure and seizure of the weapon did not violate the Fourth Amendment.  On this record there is reason to doubt that explanation.  But no findings were made.  On remand the government is free to raise this issue again, should it choose to do so.

### 3.  Plain View

The government's argument that the gun was in plain view also fails.  See Irizarry, 673 F.2d at 559 (rejecting the government's plain view argument as to evidence seized by an agent when he climbed up onto a toilet to look inside a displaced ceiling panel); United States v. Rutkowski, 877 F.2d 139, 142 (1st Cir. 1989) (rejecting a plain view argument where the incriminating nature of a seized metal was not immediately apparent).  If, after

---

[11]    In Hudson, the defendant had been removed from the house when one of the police agents returned to the defendant's bedroom and searched a rifle case that had been seen at the defendant's feet during the arrest.  100 F.3d at 1413.  The Ninth Circuit panel upheld this search as a valid search incident to arrest, not as a valid protective sweep.  Id. at 1418-20.  The Hudson court noted that the officers had "quickly completed their [security] sweep of the house" after the defendant had been removed, and the court did not include the subsequent search of the rifle case as part of the security sweep.  Id. at 1420.

-17-

the removal of Paradis, the officers had seen the gun in plain view while wrapping up the matter in the apartment, the analysis would be different.[12]  But here, the gun was not seen during any of the prior searches of the bedroom, two of which were visual searches and at least one of which was a physical search.  Rather, it was hidden under a twelve-to sixteen-inch pile of clothing and stuffed animals.  There is no plausible contention that a mere observer, standing in the bedroom or at the bedroom door, in the living room, or elsewhere, would have seen the weapon.

## B.  The Suppression of the Ammunition

Because the seizure of the gun was unlawful, the defendant argues that the ammunition obtained by the police was properly suppressed under the "fruit of the poisonous tree" doctrine.  The government argues that even if the seizure of the gun was unlawful, the attenuation doctrine should apply here and require reversal of the suppression of the ammunition.

At issue are two groups of ammunition:  a box of .25 caliber bullets left in Bell's apartment and a bag of .22 caliber bullets left on the back porch of the first floor of the apartment building.  Both sets of ammunition were suppressed under the "fruit

_____

[12]  We have recently said that a "plain view" seizure is lawful if (1) the seizing officer lawfully reached the position from which he could see the item in plain view; (2)  the seizure satisfied the probable cause standard; and (3) the seizing officer had a "lawful right of access to the object itself." United States v. Jones, 187 F.3d 210, 219-21 (1st Cir. 1999) (quoting Horton v. California, 496 U.S. 128, 138 (1990)).

of the poisonous tree" doctrine.  There is a preliminary question whether Paradis is in a position to assert a Fourth Amendment violation as to each set of ammunition.

### 1.  The .22 Caliber Ammunition

Paradis had no protectible privacy interest under the Fourth Amendment in the bag of .22 caliber ammunition left on the back porch of the building because he had no expectation of privacy in the common areas of a multi-family building.[13]  See United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999); United States v. Hawkins, 139 F.3d 29, 32-33 (1st Cir. 1998).  He also abandoned the box of ammunition found on the back porch by giving it to his neighbor, Nicole Boutot, who did not want it and who placed it on the porch.  Cf. California v. Greenwood, 486 U.S. 35, 39 (1988) ("having deposited their garbage . . . for the express purpose of having strangers take it, respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded") (internal citation and quotation marks omitted); United States v. Basinski, 226 F.3d 829, 836 (7th Cir. 2000) ("no person can have a reasonable expectation of privacy in an item that he has abandoned"); United States v. Lewis, 40 F.3d 1325, 1334 (1st Cir. 1994).  Paradis had no reasonable expectation of privacy in the box

---

[13]    Moreover, as a tenant of the building, Bell could and did consent to the police entrance into a common area.  United States v. Hyson, 721 F.2d 856, 859 n.7 (1st Cir. 1983); United States v. Marshall, No. 03-1189, 2003 WL 22445609, at *4 (1st Cir. Oct. 29, 2003).

of ammunition both because he had given the ammunition to another person, who was free to do with it what she wanted, and because it was seized from a place in which he had no privacy interest.

Paradis objects to this analysis on a temporal basis, arguing that the police did not know that Paradis had abandoned the ammunition when they seized it on the porch. This objection mixes up two issues: the issue whether Paradis had a protectible interest to assert and the issue whether the police had probable cause or were otherwise justified in the seizure. The analysis of the latter issue looks to what the police knew and what the circumstances were at the time of the seizure. The "standing" issue, by contrast, is not limited to that time frame. Paradis has the burden of establishing his protectible interest, see Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Rakas, 439 U.S. at 132 n.1, and that interest does not depend on the state of mind of the police at the time of the seizure. When abandonment is argued to show lack of a Fourth Amendment interest, a court inquires into all facts, including those not known to the police at the time of their search. LaFave, supra, § 11.3(a). After all, the question is not what the police knew but whether the defendant had a reasonable expectation of privacy in the seized object. That is why the fruit of the poisonous tree analysis proceeds only after a Fourth Amendment interest has been established. If there is no privacy interest to be protected under the Fourth Amendment, there is no

occasion to apply the fruits doctrine. LaFave, supra, § 11.4 ("a defendant . . . can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree"); cf. Rakas, 439 U.S. at 134.

### 2. The .25 Caliber Ammunition

The question whether Paradis has a protectible interest in the .25 caliber ammunition in Bell's apartment is much closer, and we assume arguendo that he may assert Fourth Amendment interests in that ammunition. We also assume arguendo that the rule of Coolidge v. New Hampshire, 403 U.S. 443 (1971), does not require denial of the suppression motion.

"Under Supreme Court precedent, the weakness of the causal connection, delay in discovery, and lack of flagrancy in the violation and like considerations may persuade a court that -- even though some causal link may exist -- a remote 'fruit' should not be suppressed." United States v. Hughes, 279 F.3d 86, 89 (1st Cir. 2002) (citing United States v. Crews, 445 U.S. 463, 471 (1980) and Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). In determining the outcome under the attenuation doctrine, the court of appeals does not defer to the district court. Id.

In addressing whether the connection between a prior illegality and challenged evidence has "become so attenuated as to dissipate the taint," Nardone v. United States, 308 U.S. 338, 341 (1939), we take into account "considerations relating to the

exclusionary rule and the constitutional principles which it is designed to protect," United States v. Ceccolini, 435 U.S. 268, 279 (1978). There is no litmus-paper test for attenuation, see LaFave, supra, § 11.4; Brown, 422 U.S. at 603 (the question of attenuation "must be answered on the facts of each case"), and the Supreme Court has rejected requests to create per se rules to govern attenuation, see Brown, 422 U.S. at 603; Ceccolini, 435 U.S. at 274-75. We conclude that the attenuation doctrine requires reversal of the suppression of the .25 caliber ammunition.

The defendant implicitly argues that, had the gun not been illegally seized, Officer Hatfield would not have asked Danyelle Bell about the gun and she, in turn, would not have produced the .25 caliber ammunition. This argument ignores the realities of Officer Hatfield's investigation. First, it was Bell, not the police, who initiated the investigation on June 30, 2002. Bell called the police and reported that Paradis had stolen her car. Second, Officer Hatfield's discussion with Bell took place five days after Paradis' arrest. Third, notwithstanding his knowledge that a firearm had been seized from Bell's apartment when Paradis was arrested, Officer Hatfield would have been aware that Paradis was a convicted felon when he responded to Bell's call for help.[14] Indeed, in his investigation report he stated that he was

---

[14] Paradis had been convicted of Aggravated Assault, a Class B felony, in the Maine Superior Court for Androscoggin County on May 7, 2001.

-22-

aware that Paradis was a convicted felon before he went to Bell's apartment. Given his knowledge of that fact, and given his observation of bruises on Bell's arms, one would have expected him to inquire about the defendant's possession of any weapons even had he not known about the previously seized gun.

Furthermore, Bell volunteered the ammunition even though Hatfield did not ask about it. Bell's impetus for volunteering the ammunition and the information about Paradis was likely a concern for her own safety. On June 24, 2002, Bell had told Paradis that if he drove her car, she would turn him in to the police. Paradis responded by throwing her to the ground, kicking her, throwing her into the hallway, and then forcing her to drive the car. After Paradis was arrested on June 25, he called Bell and told her that if he ended up in prison he would kill her and her family. In light of the defendant's statements and actions, Bell had every incentive to rid her apartment of weapons and to seek the protection of the police.

Hatfield himself was not aware that ammunition had been previously seen in the apartment. That other police officers did see the ammunition in plain view on June 25, though, is another factor pointing against suppression. If Hatfield had known about the ammunition seen on the night of Paradis' arrest, he certainly could have and would have asked Bell about it.

-23-

Taken together, the above factors suggest an even more compelling reason to deny suppression: namely, that there would be little deterrence added and a substantial cost to law enforcement in suppressing the ammunition. If Bell had not called the police, Officer Hatfield would never have been in a position to find out about the ammunition. He most likely would have asked about Paradis' possession of weapons even had he not known about the seized gun. And it was entirely fortuitous that Hatfield, and not one of the officers who had seen the ammunition in plain view, responded to Bell's call.

## C. The Suppression of the Statements By Paradis

Paradis similarly argues that the statements he made to police following his arrest on July 3, 2002 were the fruits of the prior illegal search that produced the gun. The government again points to the attenuation doctrine. We hold that the degree of attenuation was sufficient to dissipate the connection between the illegal seizure of the gun and Paradis' statements.[15]

First, accepting that the illegally seized gun may have played a role in the statements elicited from the defendant, that

---

[15] The facts of this case do not place it squarely within the analysis suggested by Brown v. Illinois and its progeny, because unlike those cases, this case does not involve an allegation that the defendant's statements are the fruit of an illegal arrest. Paradis did not challenge the legality of his arrest on July 3, 2002. Rather, the claim is that the defendant's statements were elicited as a result of the illegal search that uncovered the gun.

-24-

role is truncated by the role played by the legally seized ammunition. Not only was ammunition seen in plain view during the initial, legal search for the defendant, but the two sets of ammunition were legally obtained, as were Bell's statements about the ammunition and the gun. Even absent the seizure of the gun, there is every reason to think that the ammunition alone would have led the police to interview Paradis about his potential ownership and use of an associated firearm. See Hughes, 279 F.3d at 88-89 (finding that attenuation applied where an unlawfully used address book could have contributed to the discovery of certain witnesses, but where, among other things, the government could trace paths to those witnesses that did not go through the address book).

Second, independent of both the illegally seized gun and the legally obtained ammunition, the police had good reason to inquire into Paradis' firearm possession because he was a convicted felon and prohibited under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) from possessing firearms or ammunition and because Paradis had a history of domestic assault that was well-known to the Auburn police department.

Third, not only were the defendant's statements made seven days after the seizure of the gun, but they were also made after he was warned of his Miranda rights. Although giving a defendant Miranda warnings is insufficient alone to break the causal chain between an illegal search and a subsequent confession,

-25-

cf. Brown, 422 U.S. at 602-03 (where the primary illegality was an illegal arrest), the Miranda warnings are an important factor in this type of attenuation analysis, cf. id. at 603. Paradis did not dispute the voluntariness of his statements,[16] and when challenged statements are made by a defendant after arrest, "the degree of free will exercised by the defendant is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application." Ceccolini, 435 U.S. at 276 (citing Wong Sun v. United States, 371 U.S. 471, 491 (1963)). After receipt of the Miranda warnings, a defendant's "choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." United States v. Esquilin, 208 F.3d 315, 319 (1st Cir. 2000) (quoting Oregon v. Elstad, 470 U.S. 298, 310-11 (1985) (internal quotations omitted)).

Finally, as in our attenuation analysis of the .25 caliber ammunition, there is little added deterrence value from the suppression of the statements. Even without the illegally seized gun, it is likely that the police would have obtained the ammunition from Bell along with her statements linking Paradis to the ammunition and to a gun. That evidence would have provided sufficient basis to arrest Paradis on felon-in-possession charges and would also have provided sufficient basis to question Paradis

---

[16]    In addition, there is no indication in the record that Paradis was confronted with the gun itself during the police interview.

about the ammunition and associated firearm.  And significantly, when the police gave Paradis the <u>Miranda</u> warnings, he chose to speak to them.

## III.

The decision of the district court to suppress the gun is **<u>affirmed</u>** only as to the basis of the findings made but remanded as to further findings described above, should the government request the issue be addressed.  The suppressions of the .22 caliber ammunition, the .25 caliber ammunition, and the statements made by the defendant are **<u>reversed</u>**.  The case is **<u>remanded</u>** for further proceedings.  So ordered.