# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 2012 Session

## STATE OF TENNESSEE v.
## BRANDON KEITH OSTEIN and JAMIE LYNETTE DEAN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-842      Monte Watkins, Judge**

---

**No. M2010-01523-CCA-R3-CD - Filed October 9, 2012**

---

The Davidson County Grand Jury returned a two-count indictment charging Brandon Keith Ostein (hereinafter "Ostein") and Jamie Lynette Dean (hereinafter "Dean") as co-defendants. Count 1 charged possession with intent to sell or deliver 300 grams or more of cocaine within 1,000 feet of a school, and Count 2 charged possession of drug paraphernalia. The evidence was seized as a result of the search of Ostein's person during a traffic stop of a Hummer driven by Dean, the search of a Ford F-150 pickup truck registered to Dean and parked at a location away from the traffic stop, and the search of a residence leased to Ostein's father for which Ostein paid the rent. Ostein filed a pre-trial motion to suppress the use of all evidence against him based upon unconstitutional seizures and searches. Dean did not file a motion to suppress the use of evidence against her, and did not join in Ostein's motion. Dean did not participate in the suppression hearings. The trial court granted Ostein's motion to suppress evidence. Upon the State's request to dismiss charges against *both* Ostein and Dean, the trial court dismissed all charges against them based upon the State's representation that it could not proceed to trial. Promptly thereafter, the State filed a notice of appeal as to both Ostein and Dean. After a thorough review of the record we dismiss the State's appeal from the trial court's order dismissing, upon request of the State, the charges against Dean. As to the trial court's order suppressing evidence against Ostein, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed in Part and Reversed in Part**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellant, State of Tennessee.

Peter J. Strainse, Nashville, Tennessee, for appellee, Brandon Keith Ostein; and Cynthia M. Fort, Nashville, Tennessee, for appellee, Jamie Lynette Dean.

**OPINION**

**Suppression Hearing**

*Testimony of Agent Justin Fox*

Justin Fox, a Metropolitan Nashville police officer assigned to the 20th Judicial District Drug Task Force ("DTF"), testified that on the morning of December 5, 2008, he began a surveillance of Dean at a residence known to be "associated" with Ostein. This residence is located in the Hermitage area of Davidson County. At this time, Agent Fox was familiar with both Ostein and Dean. On two separate occasions, Agent Fox had participated in the execution of search warrants that resulted in the recovery of "large amounts of drugs and large amounts of money on Mr. Ostein." He knew that Ostein had four prior drug arrests between November 2004 and April 2006. He also knew that Dean was Ostein's girlfriend, and that she had a child fathered by Ostein. Dean drove a green Hummer vehicle from the residence in Hermitage and Agent Fox followed the Hummer to its next destination, 1314 Acklen Avenue in Nashville, where the Hummer was parked in the back yard and Dean entered the residence through the back door. Dean arrived at 11:30 a.m. Agent Fox parked his vehicle across the street in an apartment complex parking lot where he could observe the house located at 1314 Acklen Avenue. Ostein was standing on the front porch of that house when Dean arrived. Prior to this time, Agent Fox had no idea that Ostein was associated in any manner with the house on Acklen Avenue.

Ostein remained in front of the house and stared at the vehicle in which Agent Fox was sitting. Agent Fox moved his vehicle to another parking spot in the lot, but Ostein continued to stare at Agent Fox's vehicle. Other undercover officers were also maintaining surveillance of the residence at 1314 Acklen Avenue. Agent Fox decided to leave the parking lot and return to his headquarters to switch vehicles because he was concerned that Ostein was becoming too suspicious.

After he left the parking lot, Agent Fox received a report from other surveillance officers that the Hummer had left the residence on Acklen Avenue. Dean was driving the Hummer, Ostein was in the front passenger seat, and two other males were in the back seat.

-2-

One of the males was carrying a bag when all four individuals exited the house and entered the Hummer. Agent Fox knew that Dean's driver's license had been suspended. Interdiction officers began following the Hummer and stopped the vehicle approximately one-fourth of a mile from the house because Dean was weaving in the road. Agent Fox also knew on December 5 that Ostein was free on bond at the time while facing criminal charges regarding large amounts of cocaine. Agent Fox also knew that Ostein had previously been arrested in the Hummer.

After Agent Fox changed vehicles he returned to 1314 Acklen Avenue and began pulling the trash out of the garbage cans there at 1:15 p.m. The traffic stop of the Hummer and its occupants was still ongoing at that time. The Hummer had been pulled over at 12:05 p.m.

From the garbage cans Agent Fox found torn plastic baggies with white residue which tested positive for cocaine after a field test was performed, a marijuana stem, and an empty baking soda box. Agent Fox explained that baking soda is used to make crack cocaine. Agent Fox also found relevant paperwork inside the trash, including a receipt showing that $4,000.00 in cash had been paid on the purchase of a Ford F-150 pickup truck, and the receipt had Dean's name on it. Also found was a prescription for Mr. Anthony Holmes and a baggage tie with Dean's name on it. Agent Fox then proceeded to prepare, and have issued by a judge, a search warrant for the residence at 1314 Acklen Avenue.

Agent Fox had furthermore received information from officers who continued to detain Dean and Ostein at the Hummer that one of the men in the back seat was found in possession of digital scales with white residue on it. Also, $5,220.00 in cash and some vehicle keys had been taken from the person of Ostein.

Agent Fox obtained information from a leasing agent that the home at 1314 Acklen Avenue was leased to Ostein's father, Mr. Willie Davis, and that Ostein made the rental payments. After Agent Fox had written the affidavit in support of the search warrant he received additional pertinent information from a Metropolitan Nashville police detective. The detective stated that he had a reliable informant who told him that a Ford F-150 truck was parked across the street from 1314 Acklen Avenue and that Ostein's "stash" was inside the truck. The informant also reported that someone wanted the Ford F-150 moved because the "stash" was inside the truck. Agent Fox knew that Ostein had been pulled over and ticketed while driving the F-150 truck on November 19, 2008. He was also aware that Dean was the registered owner of the F-150.

Detective Simonik located the F-150 in the same apartment complex parking lot where Agent Fox had initially parked when the Hummer had arrived at 1314 Acklen Avenue. A

drug detecting canine was brought to the F-150 and was "run" around the truck. The canine "indicated" a narcotics odor in the bed of the truck. Agent Fox spent several hours on Friday afternoon, December 5, trying to locate a judge to review the search warrant and affidavit. He was unable to locate any general sessions court judges and was unsuccessful in his first attempts to locate a criminal court judge, but then he finally located Criminal Court Judge Randall Wyatt at Judge Wyatt's home. Judge Wyatt issued the search warrant at 7:23 p.m., and Agent Fox arrived at 1314 Acklen Avenue to execute the search warrant at 7:45 p.m. Seized in the house were digital scales with white residue, boxes of baggies, pill boxes prescribed to Ostein, and "paperwork."

The officers also searched the Ford F-150 truck. One of the keys taken from Ostein's person was used to unlock the cab of the truck. No drugs were found in the cab. The bed of the truck was completely covered by a locked lid. There was not a key among the ones taken from Ostein which would unlock the lid. Officers forced open the truck bed lid, and found a transparent yellow sack within which cash money was observed. The total amount of money was approximately $34,000.00. Also found in the bed of the F-150 truck were two large bags containing white powder which field tested positive for cocaine and one "brick" of a white substance that field tested positive for cocaine. The total weight of the powder and brick was 1,332 grams.

Agent Fox testified that the remote lock on the keychain taken from Ostein was *not* used to identify and locate the Ford F-150 truck in which the cocaine was found. He also reiterated that the drug sniffing canine had already "indicated" on the Ford F-150 truck *before* the search warrant was issued by Judge Wyatt.

*Testimony of Michael Lee*

Metropolitan Nashville Police Officer Michael Lee testified that he stopped the Hummer driven by Dean on the pretense that she could be intoxicated based upon the Hummer weaving from side to side traveling down the street. He testified that he had been told that Dean's driver's license was suspended. When Dean got out of the Hummer, Officer Lee smelled a "very strong" odor of marijuana coming from inside the vehicle. Metropolitan Nashville canine police officer Jaime Scruggs parked his vehicle behind Officer Lee's vehicle as the Hummer was being pulled over.

*Testimony of Jaime Scruggs*

Metropolitan Nashville Police Officer Jaime Scruggs testified that he watched Officer Lee stop the Hummer, and he pulled over at the same time. The stop was on Twelfth Avenue South. He smelled a strong odor of marijuana when the occupants got out of the Hummer.

-4-

The police told everyone to get out, and initially three persons removed themselves from the Hummer. Officer Scruggs took his drug detection canine and walked her around the Hummer. At this time he noticed a fourth individual "crunched down" in the back seat. The canine "alerted" to the odor of drugs in the Hummer. This fourth individual, Melvin Allen, was told to get out, and he gave consent to Officer Scruggs to search his person. Mr. Allen had a set of digital scales in his pocket with "quite a bit" of cocaine powder on it. Mr. Allen was charged by citation instead of being arrested. Officer Scruggs was with Ostein, Dean, Mr. Allen and the fourth individual from the time of the traffic stop until the search warrant was executed almost eight hours later. After the Hummer was searched, its occupants and the officers got off the street and went to an adjacent church parking lot. Approximately one hour after the traffic stop, Ostein, Dean, and the other two individuals were returned to 1314 Acklen Avenue where they were allowed to sit in the living room. Officer Scruggs could not remember for what time periods any of the four individuals from the Hummer may have been handcuffed. All four of the Hummer's occupants were searched "very quickly" after the stop was made. Officer Scruggs did not search Ostein, and could not remember if he actually observed Ostein being searched, but he knew that Office Bill Morgan "actually patted down" Ostein. He could not recall at what exact point items were seized from the person of Ostein, but he knew that over $5,000.00 cash was taken, as well as a set of keys for a Ford F-150 pickup truck. He could not remember whether the keys had a remote keyless entry device. Officer Scruggs "ran" his drug detecting canine around Dean's Ford F-150 pickup truck when it was parked in the apartment complex parking lot across the street from 1314 Acklen Avenue. This was done after dark on December 5, but prior to the search warrant being executed at the 1314 Acklen Avenue residence. The canine "indicated" the presence of drugs "on the rear tailgate area" of the Ford F-150. The locked lid of the bed of the truck was forced open by another officer using a crowbar.

*Testimony of Defendant Ostein*

Ostein testified that he was a passenger in the front seat of the Hummer that Dean was driving when it was stopped by police on Twelfth Avenue South on December 5, 2008. Melvin Allen and Anthony Holmes were passengers in the back seat. Approximately ten minutes after the stop had begun, officers had Ostein get out of the Hummer. Officer Morgan, who Ostein knew, patted down Ostein. Nothing was seized from Ostein's person at the time of the initial pat down. Approximately thirty to forty-five minutes later, Ostein was placed into the back of a law enforcement vehicle. Prior to being placed there, he was patted down again by Officer Morgan. During this pat down, Officer Morgan took Ostein's keys and cash from his pocket. Also at this time, Ostein was handcuffed. The handcuffs were placed on him "[a]n hour or two" after the Hummer was pulled over.

-5-

Ostein testified that he was detained on the street for approximately one and one-half hours, then was placed into the law enforcement vehicle while handcuffed and driven across the street into the church parking lot. He remained "cuffed" in the back seat of the vehicle at the parking lot for "[about an hour and a half or two hours" before being driven to 1314 Acklen Avenue. Ostein testified that he was escorted inside the house and that Agent Fox came with the search warrant about four hours later. Ostein testified that during the detention he was never told that he was not going to be charged with any offense or that we was free to go home. Ostein testified that he was never charged with possession of drug paraphernalia based upon the digital scales which were found in Melvin Allen's pocket.

On cross-examination, Ostein denied that the house at 1314 Acklen Avenue was his, and he denied paying the rent for the home. He admitted that Willie Davis is his father. Ostein testified that his friend Melvin Allen resided at 1314 Acklen Avenue. The keys seized from Ostein had both keys and a keyless remote device. Ostein admitted the keys went to a Ford F-150 on which he had made payments. Ostein put the Ford F-150 truck in Dean's name "[b]ecause I wanted to put it in her name." Ostein admitted that he had previously driven the Ford F-150 but stated that he "wasn't using it at that time." Ostein admitted that at the time of the searches and seizure on December 5, 2008, he had a "history" of failure to appear and be booked after receiving a citation in lieu of arrest, and that on December 5, 2008, he was on bond for other felony drug charges.

*Trial Court's Ruling*

After the completion of testimony the trial court heard arguments by both parties and took Ostein's suppression motion under advisement. Approximately three months later the following proceedings were held in open court:

THE COURT: As I was saying, I had an opportunity to review my notes, the pleadings in this matter, as well as review the video recording of the hearing the Court had on this matter back on January 21st of this year.

After careful review of all of the same the Court is going to grant the motion to suppress. The seizure of Mr. Ostein was illegal. The search of Mr. Ostein was illegal, to the extent that it went beyond a *Terry* pat-down. As such, the motion to suppress is granted and the fruits from that are suppressed.

* * *

[Further arguments were made by counsel for both parties.]

THE COURT:              Wait. Hold it. Hold it. This is going to go on
                        all day long. I don't take these matters lightly.
                        I ruled based on what I believe the law is. I've
                        ruled in this particular case, the fruits go along
                        with it. That's it.

[PROSECUTOR]:           That's all of the evidence?

THE COURT:              Yes.

[DEFENSE COUNSEL]:      Thank you, Your Honor.

Subsequently, the trial court entered a detailed order with its findings of fact. At one point in the order, the trial court clearly stated that the second pat down of Ostein (when, according to the evidence, the keys to the Ford F-150 were seized) was constitutionally illegal. In its conclusion, however, the order states there was "sufficient probable cause . . . to warrant the first and second pat down." In light of the trial court's initial conclusion in the order that the second pat down was not legal, and the ultimate ruling granting the motion to suppress, we conclude the quoted portion is a clerical error in the order. Therefore, we set forth below the conclusion reached by the trial court as follows with the clerical error omitted.

**Conclusion**

Based on the totality of the circumstances, the Court finds that the police had facts upon which to base a reasonable suspicion that the defendant was involved in criminal activity. The defendant Dean was driving the vehicle with a suspended license. The police officer's own observations of the defendant's behavior further bolstered the specific and articulable facts upon which the officer could base a reasonable suspicion sufficient to warrant further investigation. There was sufficient probable cause upon the observation of the strong odor of marijuana emitting from the defendant's person to warrant the first [    ] pat down. Accordingly, the defendant's seizure pursuant to an investigatory stop was not unlawful within the purview of the Tennessee and United States Constitutional

protections against unreasonable searches and seizures. *State v. Little*, 2006 WL 2571448 (Tenn. Crim. App.).

However, the Court finds that the length of the detention was unreasonable. The Metro Police Officers detained the defendant for over seven hours without any justifiable reason supported by probable cause. The seizure of the keys, money and custodial arrest of the defendant was invalid. Therefore, the evidence seized is fruit of a poisonous tree and are suppressed as well. *United States v. Ackridge*, 346 F.3d 618 (6th Cir. 2003). Specifically, the Court finds that the evidence obtained from the search of the Ford F-150 is the fruit of an illegal search and seizure. The evidence acquired from the F-150 was retrieved as a result of the illegal seizure of the vehicle key remote from defendant Ostein. The evidentiary hearing revealed that the officers used the illegally seized vehicle key remote to locate the F-150 on the premises surrounding 1314 Acklen Avenue.

Therefore, this Court further finds that the motion to suppress is respectfully GRANTED.

IT IS SO ORDERED.
Entered this the 10th day of May, 2010.

   /s/  Monte D. Watkins
MONTE D. WATKINS, JUDGE
DIVISION V

CC:   Peter Strianse, Esq.
      Hugh Ammerman, Esq.
      Cynthia M. Fort, Esq.

After the order had been entered the State filed a "Motion to Clarify." In this motion, the State challenged the trial court's following findings of fact:

Specifically, the Court finds that the evidence obtained from the search of the Ford F-150 is the fruit of an illegal search and seizure. The evidence acquired from the F-150 was retrieved as a result of the illegal seizure of the vehicle key remote from Defendant Ostein. The evidentiary hearing revealed that the officers used the illegally seized vehicle key remote to locate the F-150 on the premises surrounding 1314 Acklen Avenue.

At the hearing on the State's motion, the trial court concluded that it would not change its ruling, but that the following sentence was "an incorrect statement of the facts:" "The evidentiary hearing revealed that the officers used the illegally seized vehicle key remote to locate the F-150 on the premises surrounding 1314 Acklen Avenue."

**Disposition of the State's Appeal as to Defendant Dean**

Before addressing the merits of the State's appeal as to Ostein, we will first address the procedural problem with the State's appeal as to Dean. Dean did not file a motion to suppress evidence in this case, and Dean did not join in Ostein's motion to suppress. The transcripts of the suppression hearing and the hearing on the State's "Motion to Clarify" show that neither Dean or her counsel were present, much less participating, during those court proceedings. The order granting the motion to suppress mentions Dean's name *only* in the style of the case. Otherwise the trial court's order mentions only Ostein in the context of to whom the motion to suppress applies. The trial court's entire analysis turns on the search of *Ostein* and not Dean. Nothing is mentioned about the seizure of any evidence from the person of Dean. The ultimate conclusion in the order is that "the motion to suppress is respectfully" granted. Ostein's motion to suppress does not request or assert that evidence must be suppressed from being used against Dean. A violation of one defendant's rights guaranteed by the federal or state constitution does not necessarily result in the suppression of evidence against a co-defendant. See *United States v. Padilla,* 508 U.S. 77, 81–82, 113 S.Ct. 1936, 1938, 123 L.Ed.2d 635 (1993) (per curiam)("suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and co-defendants have been accorded no special standing.").

Dean did not ask for any evidence to be suppressed from being used against her. The minute entry of April 16, 2010, stating that Ostein's suppression motion was granted, "with an order to be entered," is styled only in Ostein's name. It does not mention Dean's name or her counsel's name. From our reading of the trial court's various minute entries, and the transcripts of the hearings, we conclude that no evidence was suppressed as to Defendant Dean. However, for whatever undisclosed reason, the State submitted a request, and a proposed order ultimately entered by the trial court, that the case against Dean should also be dismissed. This is reflected by separate minute entries for each defendant dismissing the charges. The State represented to the trial court that the order granting Ostein's motion to suppress "results in a dismissal of the charges in this matter" and included Dean's name in the style of the proposed order ultimately entered by the trial court.

A review of the suppression evidence lends credence to the conclusion that the proof and the hearing applied only to Ostein. If we were to totally affirm the trial court's order, it could only apply to Ostein, because the trial court has not suppressed any evidence against Dean. However, the State gratuitously, for unclear and unknown reasons, asked the trial court to dismiss the charges against Dean. The Rules of Appellate Procedure grant the State an appeal as of right when the trial court's pre-trial ruling has the substantive effect of dismissing the charges against a defendant. Tenn. R. App. P. 3(b)(c); *see State v. Meeks*, 262 S.W.3d 710, 719-20 (Tenn. 2008). In order for the State to have a Tenn. R. App. P. 3(C)(1) right of appeal in such circumstances, an order of dismissal of the indictment(s) must be entered. *Id*. The order of dismissal as to Dean was essentially a voluntary dismissal pursuant to Tennessee Rule of Criminal Procedure 48(a). In our view, the State is estopped from appealing its voluntary dismissal.

It is true that Dean filed a brief in this Court. It appears that Dean's counsel filed a brief out of an abundance of caution. The mere filing of the brief by Dean does not change the procedural status of the case against her based upon the transcripts, minute entries, and the order on the motion to suppress. The State's appeal against Dean is accordingly dismissed. The net result is that the indicted charges against Dean remain dismissed. We neither affirm or reverse that dismissal order of the trial court as to Dean. The remaining portion of this Court's ruling directly affects only the charges against Ostein.

**Disposition of the State's Appeal as to Defendant Ostein**

*Analysis*

We begin our analysis by taking a detailed examination of Ostein's motion to suppress to determine the exact bases he asserts entitled him to relief. Ostein lists five specific items or categories of items that he alleges should be suppressed:

(1) the Ford F-150 truck "key/remote" seized from Ostein's person on December 5, 2008;

(2) the fruits of the subsequent search of Dean's Ford F-150 truck "using the key/remote seized" from Ostein, including the canine sweep, which Ostein asserts was "a direct result of the seizure of the key/remote from Ostein;"

(3) all testimony of law enforcement agents regarding observations made by them "while engaged in said search;"

(4)     all statements made by Ostein or Dean to law enforcement agents during the
        search;

(5)     a non-specific "catch-all" category stated as "any evidence that was the result
        of investigatory leads obtained as a result of said search."

A plain reading of the items or categories of items Ostein wants suppressed reveals that the focus is on two incidents: the seizure of the key/remote from Ostein (the search of Ostein's person) and the search of the Ford F-150 truck registered to Dean. Ostein argued in the suppression motion that the officers illegally searched his person when the key/remote was found and seized because the search was without a warrant, and none of the exceptions to the search warrant requirement applied. Specifically, Ostein pointed out that the "search incident to an arrest" did not apply because Ostein had not been arrested, and in fact, there was no probable cause to arrest him at the time of the search of his person. Secondly, Ostein argued that the very limited search for weapons permitted by *Terry v. Ohio*, 392 U.S. 1 (1968) did not apply to the second, intrusive search of Ostein when the key/remote were discovered. Third, Ostein argued that his detention by law enforcement officers for over seven hours was unconstitutional and unreasonable.

As to the search of the Ford F-150 truck, Ostein argued that the evidence recovered from the search of the truck was the fruit of a previous illegal search and seizure. Specifically, Ostein asserted that since the police unconstitutionally searched him and seized the key/remote, and unconstitutionally detained him, "[t]hese illegalities requires suppression of the key/remote found in Defendant Ostein's possession, and all items recovered from the Ford F-150 which the key/remote unlocked."

Ostein did not specifically contest the validity of the issuance or execution of the search warrant or the admissibility of evidence seized pursuant to execution of the search warrant. Neither did Ostein specifically allege that issuance of the search warrant, and any evidence seized pursuant to execution of the search warrant, were the fruits of any illegal search, seizure, or detention. Prior to testimony, Ostein's counsel did not expand the scope of the suppression motion during opening statements. In fact, opening remarks were confined to the issue of Ostein's standing to challenge the search of the Ford F-150 truck.

In closing arguments at the suppression hearing, counsel for Ostein initially confined his argument as follows. The initial pat down *Terry* "search" to check for weapons when Ostein got out of the Hummer was constitutionally permissible. However, the second search, when the keys and remote were seized was unconstitutional because there was no probable cause for arresting Ostein or for searching him at that time. Furthermore, Ostein's counsel

asserted that the lengthy detention for more than seven hours was without probable cause for an arrest.

The State's response during arguments at the suppression hearing was that the *only* "suppressible" evidence, if any, under Ostein's motion and the evidence at the hearing, was the keys and remote and cash taken from Ostein and any statements made during Ostein's detention. The State made explicitly clear its theory as to the search of the Ford F-150. The search of the Ford F-150 was going to be made whether or not the keys/remote were in possession of the officers. The prosecutor argued,

> Now, you heard the testimony from Detective Fox. They had a drug dog alert on this vehicle. They had a search warrant commanding them to search vehicles on the premises with a nexus to the house. They knew it was Jaime Dean's vehicle. They were going to search it regardless of whether or not they had the keys. So, regardless of the detention and implications that it may have, the car [Ford F-150] was being searched.

In rebuttal argument, Ostein's counsel asserted that the search of the Ford F-50 was a fruit of the unlawful detention of Ostein, because the officers did not connect Ostein to the Ford F-150 truck until the key seized from Ostein was used to unlock the cab area of the truck. Ostein's counsel argued,

> And consistent with what is in the search warrant they're authorized to search vehicles that are found on the premises, or in close proximity, which have a nexus to the location or the person's [sic] present at the location. So that is a direct fruit of that illegal detention. When they put the key into the lock of that vehicle they knew there was a nexus between Brandon Ostein and that vehicle.

In the final argument to the trial court at the suppression hearing, the State reiterated that the proof showed that the license plate on the truck identified the truck as being registered to Dean and that the officers had a "tip" that Ostein's "stash" was located in the truck. Implicitly the State argued that this information provided a nexus between the Ford F-150, Ostein, and the residence at 1314 Acklen Avenue.

Ostein never challenged issuance of the search warrant, or the execution of the search warrant on the Ford F-150 except *only* to the extent he argued that the nexus of the truck to 1314 Acklen Avenue was established solely by the keys and remote seized from him. Ostein implicitly conceded that if there had been other facts to establish the nexus between the truck

-12-

and the residence, the search of the truck and seizure of the evidence therein pursuant to the search warrant would have been constitutional.

Not until *after* the trial court announced its decision in open court, approximately three months after the suppression hearing, did Ostein's counsel even hint that issuance and execution of the search warrant was broadly tainted by an illegal detention of Ostein and search of his person. The trial court had announced that the motion to suppress was granted "and the fruits from that are suppressed." Immediately, the State sought clarification of the scope of the suppression order. Specifically the state argued that what was seized from the search of the Ford F-150 should not be suppressed because even if seizure of the keys and remote and the detention of Ostein were illegal, that did not lead to the search of the truck.

Counsel for Ostein argued in response,

> Your Honor, we briefed the issue of fruit to [sic] the poisonous tree. And it was our insistence that at the seizure of his person and what they found on his person led to the subsequent search of the home and subsequent search of the vehicle, and there was nothing to attenuate the taint of the prior illegality. That's found at pages ten and eleven of the memorandum in support of the motion to suppress. So that was the argument that we advanced to the Court at the hearing.

The trial court ultimately ended arguments by the parties at the hearing when its decision was announced, by stating,

| THE COURT: | Wait. Hold it. Hold it. [sic] This is going to go on all day long. I don't take these matters lightly. I ruled based on what I believe the law is. I've ruled in this particular case, the fruits go along with it. That's it. |
|---|---|
| [PROSECUTOR]: | That's all of the evidence? |
| THE COURT: | Yes. |
| [DEFENSE COUNSEL]: | Thank you, Your Honor. |

Just prior to the above being said, Ostein's counsel, for the first time in the proceedings, challenged the scope of the search warrant's authority to search the Ford F-150. Counsel argued,

-13-

Your Honor, even if there was an independent basis to search the residence on Acklen as a result of the trash pull, this vehicle was not in front of Acklen. It was down, probably, a hundred yards or more, down the street, at the corner of Acklen and Twelfth, at a parking lot of an apartment complex. I don't think that the issuing magistrate envisioned that all cars on Acklen would be somehow attached to that residence and be under the umbrella of that search warrant.

Ostein's challenge to the permissible authorized scope of the search warrant came too late. It was not asserted in the pleadings or at the suppression hearing. Waiting until after the trial court had ruled in his favor, and the State sought clarification of the extent of the suppression order, did not preserve this theory of relief for Ostein. That precise issue is waived and will not be further considered in this appeal. *See* Tenn. R. Crim. P. 12(f)(1) (failure to raise a suppression issue pre-trial results as a waiver of the right to raise the issue on appeal); *see also* Tenn. R. App. P. 36(a); *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998); and *State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988)(citing Tenn. R. Crim. P. 47)("A motion to suppress, like any other motion, is required to state the grounds upon which it is predicated with particularity," and the motion "must be sufficiently definite, specific, detailed and non-conjectural, to enable the court to conclude a substantial claim . . . [is] presented.").

In any event, Ostein does not present this issue on appeal as a basis to affirm the trial court's judgment. On appeal, Ostein asserts the same arguments and theories for relief previously, and timely, presented to the trial court prior to the suppression hearing in his motion to suppress evidence.

The State, as the appellant in this case, presents two arguments that it says supports the conclusion that the trial court erred. First, the State asserts that the warrantless seizure of the keys and remote from Ostein was constitutionally acceptable because it resulted from a search incident to Ostein's arrest. Second, the State argues that the search of the Ford F-150 was conducted pursuant to a valid search warrant and that therefore the evidence found in the bed of the truck should not be suppressed.

The findings of the fact by the trial court in a suppression hearing will be upheld by the appellate court unless the evidence preponderates otherwise. *State v. Williams*, 185 S.W.3d 311, 314 (Tenn. 2006). The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. *Id*. at 314-15. The application of the law to the facts is a question of law that the appellate court reviews de novo. *Id*. at 315. The burden is on the State to prove that a warrantless search was

-14-

constitutionally permissible. *State v. Nicholson*, 188 S.W.3d 649, 656-57 (Tenn. 2006). Conversely, when a defendant seeks suppression of evidence seized pursuant to a search warrant the burden is on the defendant to prove by a preponderance of the evidence "the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant." *State v. Henning*, 975 S.W.2d 290, 298 (Tenn. 1998).

As noted above, Ostein did not challenge either the validity of the search warrant or the search conducted pursuant to the warrant. Without even challenging these, obviously Ostein did not carry his burden to show the evidence found inside the bed of the Ford F-150 should be suppressed for those reasons. Thus, the only challenge involving the search warrant which can avail Ostein is that the issuance of the warrant, or the search of the Ford F-150 pursuant to the warrant, was the fruit of an illegal search of Ostein and seizure from him of the keys and remote to the truck.

The trial court made the following findings of fact and conclusions of law in the order granting the motion to suppress:

> The seizure of the keys, money and custodial arrest of the defendant was invalid. Therefore, the evidence seized is fruit of a poisonous tree and are suppressed as well. [citation omitted]. Specifically, the Court finds that the evidence obtained from the search of the Ford F-150 is the fruit of an illegal search and seizure. The evidence acquired from the F-150 was retrieved as a result of the illegal seizure of the vehicle key remote from defendant Ostein.

We note that the trial court determined the lengthy detention of Ostein (over seven hours) was illegal and unconstitutional. However, the trial court was very specific as to what it concluded was the direct cause of the search of the F-150: the *seizure* of the "key remote" which occurred, according to the proof, between thirty minutes and one and one-half hours into the detention. The trial court did *not* conclude that the lengthy detention itself resulted directly in the search of the F-150.

The trial court essentially determined that there was no probable cause to *search* Ostein, or probable cause for an *arrest* of Ostein at the time he was searched and the key and remote and the cash were seized from his person at the site of the police stop of the Hummer. The State argues that this warrantless search was a lawful search as an exception to the warrant requirement, i.e., a search incident to a lawful arrest. Our supreme court has stated,

> In order to justify a warrantless search as incident to a lawful arrest, four conditions must be met: (1) the arresting officer must have probable cause

to believe that the defendant had engaged or was engaging in illegal activity, *State v. Crutcher*, 989 S.W.2d 295, 300 (Tenn. 1999) (holding that a "custodial arrest," which is required to justify a search as incident to arrest, must be "based on probable cause"); (2) the probable cause must attach to an offense for which a full custodial arrest is permitted – i.e., there must be statutory grounds for a warrantless arrest, see Tenn. Code Ann. §§ 40-7-103, 40-7-118(c) (2006); *cf. State v. Walker*, 12 S.W.3d 460, 467-78 (Tenn. 2000); (3) the arrest must be consummated either prior to or contemporaneously with the search, *Crutcher* 989 S.W.2d at 302 n. 12; and (4) the search must be incident to, not the cause of, the arrest. *Id*. at 302 (observing that "[i]t is axiomatic that a warrantless police search may not precede an arrest and serve as part of its justification"); *see Smith v. Ohio*, 494 U.S. 541, 543, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990); *Hughes v. State*, 588 S.W.2d 296, 308 (Tenn. 1979) (observing that "no search or frisk 'unlawful at its inception may be validated by what it turns up'") (quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

*State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009).

The State in its brief does not specify for what offense Ostein had been arrested at the time of the challenged search of his person, other than "suspicion of illegal drug activity." More telling is the State's candid acknowledgment that Ostein was placed under arrest "no later than the time [he was] *transported* from the scene of the initial stop to Ostein's Acklen Avenue home." Furthermore, while the State grasps at facts concerning information obtained from the search of the trash at 1314 Acklen Avenue and from another officer's confidential informant, the time line of these events is not clear in the record in relation to when the search was done.

We conclude that the evidence does not preponderate against the findings of fact of the trial court regarding the seizure of the keys and remote and the cash from the *person* of Ostein at the site of where the Hummer was pulled over. Regarding the seizure of the keys and remote from Ostein, taking the strongest legitimate view of the evidence at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence, we conclude that the trial court did not err by suppressing as evidence the keys and remote seized from Ostein. The keys and remote, any mention of keys and remote seized from Ostein, and the facts that the keys and remote were for the Ford F-150 or were used to open the cab of the Ford F-150 are inadmissible. In other words, the keys and remote to the Ford F-150 that were illegally seized from Ostein cannot be utilized as

evidence in the State's case-in-chief against Ostein in order to connect Ostein to the Ford F-150 truck.

That being resolved we will now address whether the search of the bed of the Ford F-150 was the fruit of the illegally seized keys and remote. In *State v. Ingram*, 331 S.W.3d 746 (Tenn. 2011), our supreme court addressed the issue of whether an unconstitutional search of the person of the defendant at a traffic stop caused the later, and otherwise valid, consensual search of the defendant's home to be constitutionally invalid as "fruit of the poisonous tree." The court in *Ingram* noted,

> Under the "fruit of the poisonous tree" analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality. *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996) (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

*Ingram*, 331 S.W.3d at 760.

Factors to consider whether subsequently found evidence must be suppressed as fruit of the poisonous tree are, (1) the temporal proximity of the illegal seizure and the subsequent search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* at 761, (relying upon *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

However, an obvious point concerning applicability of the fruit of the poisonous tree doctrine, is that the facts must show that the illegally seized evidence directly led to the subsequent challenged search, in this case the search of the bed of the Ford F-150 truck. In this, the evidence overwhelmingly preponderates against the finding of fact by the trial court that "[t]he evidence acquired from the F-150 was retrieved as a result of the illegal seizure of the vehicle key remote from Defendant Ostein."

The evidence at the suppression hearing was that the Ford F-150's location and its registration to Dean were confirmed entirely independently of the key and remote seized from Ostein. The uncontradicted testimony was that the keys and remote were *not* used to locate the truck. Furthermore the truck bed where the evidence was found was locked and had to be pried open because no key on the key ring and remote unlocked the lid. A drug canine "hit" on the bed of the truck, and a confidential informant stated Ostein's "stash" was in the truck. The Ford F-150 was not searched until after the search warrant had been issued, and the search warrant authorized the officers to search any vehicle, found in proximity to 1314 Acklen Avenue, with a nexus to persons present at 1314 Acklen Avenue. As discussed above, Ostein did not challenge issuance of the search warrant or the search conducted

pursuant to the warrant except to allege the search was a fruit of the illegally seized keys and remote. Based upon this evidence and the above-cited law, we conclude that the trial court erred by suppressing the cocaine and money found in the bed of the F-150 pickup truck. The search of the bed of the Ford F-150 was not the fruit of the seizure of keys and remote from Ostein.

## CONCLUSION

For the reasons stated, and to the extent consistent with this opinion, the trial court's order suppressing the evidence of the keys and remote seized from Ostein is affirmed. Insofar as the trial court's order suppressed evidence of the cocaine and money seized from the bed of the Ford F-150 truck, the order of the trial court is reversed, the motion of Ostein to suppress the cocaine and cash seized from the truck is denied, the indictment against Ostein is reinstated, and his case is remanded to the trial court for further proceedings. The State's appeal as to Dean is dismissed. The indictment as to Dean remains dismissed, and we neither affirm nor reverse the trial court's judgment dismissing the indictment as to Dean.

_____
THOMAS T. WOODALL, JUDGE